437 A.2d 1198

**Howard Lewis RUTTER, a minor, by his parents and natural guardians, Billy Dean Rutter and Lucy Rutter and Billy Dean Rutter and Lucy Rutter, in their own right, Appellants,**

v.

**The NORTHEASTERN BEAVER COUNTY SCHOOL DISTRICT, Gregg Zimmerman and John North, and Thomas W. George, Jr., Appellees.**

Supreme Court of Pennsylvania.

Argued Sept. 15, 1981.

Decided Dec. 17, 1981.

---

592

594

W. Arch Irvin, Jr. and R. E. Wayman, Irvin & McAuley, Pittsburgh, for appellants.

Richard J. Mills and Eric N. Anderson, Pittsburgh, for Thomas W. George, Jr. and John North.

Nick A. Frisk and Thomas Minett, Ellwood City, for Northeastern Beaver County School Dist.

Oran W. Panner, Beaver, for Gregg Zimmerman.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, KAUFFMAN and WILKINSON, JJ.

## OPINION

FLAHERTY, Justice.

On July 13, 1970, Howard Rutter, a boy of sixteen, was injured while participating in a Riverside High School summer football practice. The practice was supervised and conducted by two football coaches, appellees John North and

Thomas W. George, Jr. At the time of the injury, the team, without wearing protective equipment, was engaged in a game of "jungle football." Rutter was injured when a player on the opposing side, appellee Zimmerman, struck him in the right eye with an outstretched hand, causing blindness due to a detached retina.

Rutter and his parents then filed suit against the Northeastern Beaver County School District, Riverside High School coaches Thomas W. George, Jr. and John North, and the opposing player, Gregg Zimmerman. The case went to trial and at the close of appellant's case, appellees moved for and were granted a compulsory nonsuit. A motion to strike the nonsuit was denied by the trial court *en banc*, and the decision was appealed to the Superior Court, 283 Pa.Super. 155, 423 A.2d 1035, who affirmed the denial, Spaeth, J., dissenting. We granted allocatur and reverse.

Appellant argues that (1) it was error for the court to enter a compulsory nonsuit; (2) the lower court erred in refusing to admit expert testimony; and (3) the lower court erred in holding, as a matter of law, that appellant voluntarily assumed the risk of all injuries incurred in playing jungle football.

## TRIAL ERRORS

The standard for reviewing the validity of a compulsory nonsuit is as follows:

> ... plaintiff must be given the benefit of every fact and reasonable inference arising from the evidence. (Citations omitted.) All conflicts in the testimony must be resolved in plaintiff's favor and the entry of the compulsory nonsuit is only supportable in a clear case where the facts and circumstances have as the only conclusion the absence of liability.

*McKenzie v. Cost Brothers*, 487 Pa. 303, 307, 409 A.2d 362, 364 (1979). In other words, "[a] nonsuit should be entered *only in a clear case*, and, on appeal from the refusal to take off a compulsory nonsuit, *the plaintiff must be given the benefit of all favorable testimony and every reasonable*

*inference of fact* arising therefrom and *all conflicts therein must be resolved in favor of plaintiff."* (Emphasis supplied.) *Cushey v. Plunkard*, 413 Pa. 116, 117, 196 A.2d 295, 296 (1964).

The facts and testimony of record read in the light most favorable to the appellant reveal that appellant, at the time of the injury, was sixteen years old and was engaged in a pre-season football training and practice activity sponsored by Riverside High School. This practice, conducted under the supervision of the school's football coaches, proceeded without the use of protective equipment in spite of the fact that certain aspects of the practice involved rough body contact. Appellant had played football on the school team during the prior two years and had been a starting member of the team. He had also played "jungle football" during previous football practice sessions and was generally familiar with the game. Appellant and other members of the team attended a preseason football meeting during which the football coach informed them of the existence of the pre-season practice sessions and caused them to believe that if they did not attend the pre-season practice and training sessions, they would be unlikely to make the team. The practice sessions included various physical activities, such as weight lifting, running, hitting the blocking sled, and jungle football. Team members were expected to participate in all aspects of the practice sessions. On the day of the injury, the coach directed the team to begin a game of jungle football after other aspects of that day's practice had been concluded. Play in the jungle football exercise was rough, involving body blocks, tackling, and the participants played hard, hoping to impress the coaches. The coaches themselves played in the jungle football game, and during the game, therefore, were not in a position to supervise the play. Appellant testified that he did not anticipate the loss of an eye as an injury he was likely to suffer while playing football.

The game of jungle football as played by the Riverside football team was a variant on two-handed touch football in

which any number of players was able to participate. Each team had four downs in which to score, and play began at a line of scrimmage. After the ball was snapped, the ball carriers or receivers could throw any number of forward, lateral or backward passes without regard to the thrower's position on the field, either in front of or behind the line of scrimmage. Because of the unlimited passing of the ball, the game was fast-paced. Play was stopped when the ball carrier was tagged with two hands, or tackled, or when a pass fell incomplete.

The lower court held that appellant assumed the risk of the injury which he suffered; that appellant failed to make out a case of negligence; and that appellant's expert should not be permitted to testify. We first address the issue of expert testimony.

Appellant attempted to introduce the expert testimony of Frank Cipriani, a former coach, to establish that the coaches of the Riverside football team were not conducting summer football practice sessions in conformity with the safety standards maintained at other Pennsylvania high schools, and that the practice sessions were in violation of the rules promulgated by the Western Pennsylvania Interscholastic Athletic League (W.P.I.A.L.).[1]  The Pennsylvania

1.  The transcript indicates the following with respect to the offer of proof:
    MR. IRVIN:  I call Mr. Frank Cipriani.
    FRANK P. CIPRIANI, called as a witness, having been first duly sworn, testified as follows:
    DIRECT EXAMINATION
    BY MR. IRVIN:
    Q.  Give the Court and jury your full name.
    A.  Frank P. Cipriani
    Q.  How old are you, Mr. Cipriani?
    A.  Thirty-seven years old.
        MR. MILLS:  Excuse me.  May we have permission to approach the Bench.
        THE COURT:  Very well.
    (Whereupon, Mr. Irvin presented his offers of proof as to Mr. Cipriani—testimony as to coaching standards, use of safety equipment, testimony as to WPIAL Rules—reported, not transcribed. Counsel for Defendants having made objections to the offers of proof, the Court sustained the objections.  Whereupon, Mr. Irvin

standard of qualification for an expert witness is a liberal one. "If a witness has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given to his evidence is for the jury." *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 338, 319 A.2d 914, 924 (1974). Coach Cipriani is a former football coach who has knowledge of the W.P.I.A.L. rules and the customary safety practices and procedures appropriate to high school football. As a former coach, Cipriani has specialized knowledge of the subject matter in question. His testimony is admissible provided that the ultimate determination of whether defendant's conduct was negligent is left to the jury and that the subject matter is not within the common knowledge of laymen. *Densler v. Metropolitan Edison Co.*, 235 Pa.Super. 585, 593, 345 A.2d 758 (1975). In *Reardon v. Meehan*, 424 Pa. 460, 227 A.2d 667 (1967) we held that a qualified expert may be permitted to assert a relevant fact not generally known, but known to him because of his special training and experience. It seems clear that an experienced former football coach may have knowledge of the customs and safety standards utilized by coaches of high school football teams and of the rules imposed by the W.P.I.A.L. to insure minimum safety, which knowledge is not within the common knowledge of the average juror. This knowledge is relevant to the central question of negligence. The trial court, therefore, was in error in refusing to admit the testimony of Coach Cipriani.

On the question of negligence, the trial court concluded that "no amount of supervision, instruction or equipment could have prevented" the injury, and for this reason, the negligence, if there was any, was not the proximate cause of the accident. The evidence, according to the trial court, "was not sufficient to permit the jury to consider the question of negligence." Remembering that in considering the validity of a compulsory nonsuit, *"the plaintiff must be given the benefit of all favorable testimony and every*

rested Plaintiff's case as to liability. Counsel for Defendants moved for a compulsory non-suit, Court granted motions for compulsory non-suit.)

*reasonable inference of fact arising therefrom and [that] all conflicts therein must be resolved in favor of the plaintiff,"* Cushey v. Plunkard, supra, the trial court's determination that there was no question of negligence for the jury was patent error. As Judge Spaeth remarks in his dissent, both the majority of the Superior Court and the Court of Common Pleas sitting *en banc,* ignored the testimony favorable to the appellant and, instead, viewed the evidence in the light most favorable to the *appellee,* thus reversing the very standard of review under which they were supposed to be operating.

■ The Superior Court, for example, concluded that jungle football is no more dangerous than other forms of football and that the coaches were not negligent in their supervision of the game. Taking the evidence in the light most favorable to appellant, a "touch" football game in which tackling and body blocking occurs, which is initiated and supervised by the football coaches, in which no equipment is used, and which is played by team members attempting to impress coaches who are themselves engaged in the game, may be said at least to present a jury question as to the dangerousness of the game and the negligence of the coaches.

■ A further example of viewing the evidence in the light most favorable to appellees instead of to appellants, this time from the *en banc* opinion of the Court of Common Pleas, is the court's conclusion that protective equipment would not have prevented the injury and that the lack of supervision, if any, was not the proximate cause of the injury. Once again, taking evidence in the light most favorable to the appellant, a "touch" football game in which body blocking and tackling occurs, in which the coaches themselves participate instead of monitoring, may be said at least to present a jury question as to the negligence of the coaches in not providing protective equipment and in not monitoring the play. The lower courts were, therefore, in error in concluding that appellant had not made out a case of negligence sufficient to go to the jury.

With regard to the assumption of risk issue, the trial court ruled that appellant, as a matter of law, was precluded from maintaining the action because he assumed the risk of the injury which he received. The doctrine of assumption of risk, as cited by the trial court, is articulated in the Restatement of Torts 2d at § 496 A: "A plaintiff who assumes a risk of harm arising from the negligent or reckless conduct of the defendant cannot recover for such harm." (Hereafter the Restatement of Torts 2d shall be cited merely as Restatement.) This statement of law, so far as it goes, is correct, but for the reasons that follow, we hold that the trial court erred in barring the appellant's action on the assumption of risk theory.

As indicated in Part II *infra*, the Restatement categorizes assumption of risk into four discrete types. § 496 A, comment c, 1–4. Type 2, which could be applicable to this case,[2] is described as follows:

> 2. [P]laintiff has entered voluntarily into some relation with the defendant which he knows to involve the risk, and so is regarded as tacitly or impliedly agreeing to relieve the defendant of responsibility, and to take his own chances.

Thus, appellant allegedly assumed the risk by voluntarily entering into the player-team relationship. The relief from responsibility granted a defendant under this section arises by operation of law and is a legal consequence of the relationship.

The Restatement authors give § 496 C as a further reference concerning this type of assumption of risk. Most importantly, section 496 C, comment "a" indicates that knowledge and voluntariness are elements of an implied assumption of risk, and that these elements are discussed at sections 496 D and E, respectively. The policy behind implied assumption of risk, indicated at § 496 C, comment "b", is that "the law refuses to permit one who manifests willingness that another shall continue in a course of conduct to

2. As indicated in Part II, *infra*, the present case may fit into more than one of the Restatement's types.

complain of it later if he is hurt as a result of it." The problems of knowledge and voluntariness will be discussed presently, but first we consider the import of this policy statement.

An initial question, in light of this policy, is whether there was in fact a manifestation in this case of a willingness that appellee should continue in its course of conduct. Comment "h" of section 496 C deals with this problem:

> h. *Manifestation of acceptance.* The basis of assumption of risk is consent to accept the risk. In order for assumption of risk to be implied from the defendant's conduct, it must be such as fairly to indicate that the plaintiff is willing to take his chances. Implied consent is consent which exists in fact, but is manifested by conduct rather than by words. *It is not every voluntary encountering of a known and understood danger which is reasonably to be interpreted even as evidence of actual consent.* A plaintiff, for example, who dashes into the street in the middle of the block, in the path of a stream of cars driven in excess of the speed limit, certainly does not manifest consent that they shall be relieved of the obligation of care for his safety. This is merely contributory negligence, and not assumption of risk.
>
> Since the interpretation of conduct is seldom so clearly indicated that reasonable men could not differ as to the conclusion, it is ordinarily a question for the jury whether what the plaintiff has done is a manifestation of willingness to accept the risk.

(Emphasis supplied.)

■ In the present case, appellant does not admit that he accepted or even knew of the risk. Since the question of whether appellant's behavior manifested acceptance of risk is precisely the kind of question on which reasonable men can disagree, the question should have been presented to the jury.

Even if it could be said that appellant's behavior manifested an assent to take the risk, however, there are questions as to the appellant's comprehension of danger and voluntari-

ness of action. Accordingly, we turn to Restatement §§ 496 D and E on the questions of comprehension and voluntariness.

Section 496 D and pertinent comments, concerning knowledge and appreciation of risk, provide:

§ 496 D. *Knowledge and Appreciation of Risk* except where he expressly so agrees, a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character.

Comment:

. . . . .

b. The basis of assumption of risk is the plaintiff's consent to accept the risk and look out for himself. Therefore he will not be found, in the absence of an express agreement which is clearly so to be construed, to assume any risk unless he has knowledge of its existence. This means that he must not only be aware of the facts which create the danger, *but must also appreciate the danger itself and the nature, character, and extent which make it unreasonable.* Thus the condition of premises upon which he enters may be quite apparent to him, but the danger arising from the condition may be neither known nor apparent, or, if known or apparent at all, it may appear to him to be so slight as to be negligible. In such a case the plaintiff does not assume the risk. His failure to exercise due care either to discover or to understand the danger is not properly a matter of assumption of risk, but of the defense of contributory negligence.

c. *The standard to be applied is a subjective one*, of what the particular plaintiff in fact sees, knows, understands and appreciates. In this it differs from the objective standard which is applied to contributory negligence. (See §§ 464, 289 and 290.) *If by reason of age, or lack of information, experience, intelligence, or judgment, the plaintiff does not understand the risk involved in a known situation; he will not be taken to assume the risk,* although it may still be found that his conduct is contributo-

ry negligence because it does not conform to the community standard of the reasonable man.

. . . . .

e. Whether the plaintiff knows of the existence of the risk, or whether he understands and appreciates its magnitude and its unreasonable character, is a question of fact, usually to be determined by the jury under proper instructions from the court. The court may itself determine the issue only where reasonable men could not differ as to the conclusion.

(Emphasis supplied.)

It is axiomatic that appellant cannot be found to have implicitly assumed a risk of which he had no knowledge. Comment "b" states that the whole concept of implied assumption is based on the actor's consent to accept the risk and look out for himself, which necessarily entails, according to comment "b", that the actor understand the "nature, character, and extent of the danger *in addition to* the facts which create the danger (comment "b"). The standard of knowledge applied under this section is subjective, which means that the trier of fact, in determining what knowledge appellant had, may consider his age, lack of information, experience, intelligence or judgment (comment "c"). We are concerned with what *appellant actually knew*, and not what the reasonable man should have known. As comment "e" indicates, "the court may itself determine the issue only where reasonable men could not differ as to the conclusion."

In this case, appellant's testimony was: "I never imagined that I would lose my eye." Viewing the testimony in the light most favorable to appellant, he did not knowingly encounter the danger. Since appellant's knowledge is assessed on a subjective basis, and since appellant was a young person of limited experience, it was improper for the court to grant a compulsory nonsuit as a matter of law based on appellant's supposed assumption of risk.

Barring the action on an assumption of risk theory was error also because there is a question as to whether appel-

lant's action was voluntary. Restatement § 496 E and pertinent comments concerning voluntariness, provide:

(1) A plaintiff does not assume a risk of harm unless he voluntarily accepts the risk.

(2) The plaintiff's acceptance of a risk is not voluntary if the defendant's tortious conduct has left him no reasonable alternative course of conduct in order to . . .

(b) exercise or protect a right or privilege of which the defendant has no right to deprive him.

Comment:

c. The plaintiff's acceptance of the risk is not to be regarded as voluntary where the defendant's tortious conduct has forced upon him a choice of courses of conduct, which leaves him no reasonable alternative to taking his chances. *A defendant who, by his own wrong, has compelled the plaintiff to choose between two evils cannot be permitted to say that the plaintiff is barred from recovery because he has. made the choice. Therefore, where the defendant is under a duty to the plaintiff, and his breach of duty compels the plaintiff to encounter the particular risk in order to avert other harm to himself, his acceptance of the risk is not voluntary, and he is not barred from recovery. The same is true where the plaintiff is forced to make such a choice in order to avert harm to a third person.* It is true likewise where the plaintiff is compelled to accept the risk in order to exercise or protect a right or privilege, of which the defendant has no privilege to deprive him. *The existence of an alternative course of conduct which would avert the harm, or protect the right or privilege, does not make the plaintiff's choice voluntary, if the alternative is one which he cannot reasonably be required to accept.*

(Emphasis supplied.)

■ The voluntariness of the assumption of risk remains at issue in this case because appellant may have been wrongfully forced to choose between two evils. Voluntariness cannot be implied merely from the fact of a relation-

ship. That appellant volunteered to play football is not dispositive of whether he voluntecred to play jungle football. For the sake of deciding whether appellant is barred on an assumption of risk theory pursuant to § 496 E(2)(b), and viewing the evidence in the light most favorable to appellant, we may assume that appellee's conduct was in fact tortious. We may also assume that the appellant, in trying out for the football team, was exercising a right or privilege connected with his enrollment at Riverside High School, and that appellees had no right to deprive him of this right or privilege. The question, therefore, is whether appellant "voluntarily" assumed the risk.

█ Reviewing the evidence in the light most favorable to appellant, we conclude that the football coach announced prior to the summer vacation that there would be pre-season football conditioning practice and implied that those boys not participating would not be likely to make the team; jungle football was a part of the conditioning practice drills and participation was expected in all aspects of the practice including jungle football. There is at least a question for the jury, then, as to whether appellant was compelled to accept the risk of playing jungle football in order to exercise or protect his right or privilege to play football (§ 496 E, comment "c"). If he was so compelled, the acceptance of the risk was not voluntary, and thus he was not subject to the bar of the rule. Similarly, there is at least a question for the jury as to whether appellant had a reasonable alternative course of action (§ 496 E, comment "c"). The court, therefore, was in error in granting a compulsory nonsuit since there was a jury question as to whether the assumption of risk, if any, was voluntary, and if it was not, whether there was a reasonable alternative course open to appellant.

For these reasons, we hold that the lower court erred in the following respects: in denying appellant's expert an opportunity to testify; in deciding that appellant had not made out a sufficient case of negligence to go to the jury; and in granting a compulsory nonsuit against appellant

because he had not made out a sufficient case of negligence to go to the jury and because he was barred from recovery by application of the assumption of risk doctrine. Because the assumption of risk doctrine presents serious problems of application and analysis, as evidenced by this case, we deem it appropriate to explore further the origins of the doctrine and the question of whether it should continue to be used in the Commonwealth.

## II. THE ASSUMPTION OF RISK DOCTRINE

The assumption of risk doctrine is a late development in the common law, having achieved a certain notoriety because it came to be associated with master-servant cases. It was used in these cases as a device to prevent workmen from recovering against their employers for injuries received during employment. *See* Prosser, The Handbook of Torts § 67 (3d Ed. 1964) (Hereafter Prosser); Bohlen, "Voluntary Assumption of Risk," 20 Harv.L.Rev. 14 (1906) (Hereafter Bohlen). As the United States Supreme Court remarked in *Tiller v. Atlantic Coast Line R. Co.*:

> Assumption of risk is a judicially created rule which was developed in response to the general impulse of common law courts at the beginning of this period [the industrial revolution] to insulate the employer as much as possible from bearing the "human overhead" which is an inevitable part of the cost—to someone—of the doing of industrialized business. The general purpose behind this development in the common law seems to have been to give maximum freedom to expanding industry.

318 U.S. 54 at 58–59, 63 S.Ct. 444 at 446–47, 87 L.Ed. 610 (1943). Although the doctrine gained widespread legal acceptance in the master-servant cases, it has never been restricted to such cases. Rather, the doctrine applies to many different settings apart from an employment context and reflects the individualism of the common law:

> The maxim *volenti non fit injuria* is a terse expression of the individualistic tendency of the common law, which proceeding from the people and asserting their liberties,

naturally regards the freedom of individual action as the keystone of the whole structure. Each individual is left free to work out his own destinies; he must not be interfered with from without, but in the absence of such interference he is held competent to protect himself. While therefore protecting him from external violence, from imposition and from coercion, the common law does not assume to protect him from the effects of his own personality and from the consequences of his voluntary actions or of his careless misconduct.

The doctrine of the so-called voluntary assumption of known risks is but one of the expressions of this fundamental idea; other exhibitions of it, differing only with the conditions to which the conception is applied, are the defenses of consent and of contributory negligence. None of these is identical with any other, none is derived from the other; all are derivatives from a common source.

In the law of torts, at least, the idea of any obligation to protect others was abnormal.

Bohlens, supra at 14. There is a serious question as to whether the doctrine of assumption of risk, which has had its origins in a now somewhat disfavored legal philosophy and which has presented problems of application of a type well illustrated by this case, should be permitted longer to survive. For reasons apparent in the following discussion we think it should not.

The complexity of the doctrine and its consequent difficulty of application are well illustrated in the Restatement's analysis of the four discrete meanings of the term given at § 496 A, comment c, 1–4:

1. In its simplest form, assumption of risk means that the plaintiff has given his express consent to relieve the defendant of an obligation to exercise care for his protection, and agrees to take his chances as to injury from a known or possible risk. The result is that the defendant, who would otherwise be under a duty to exercise such care, is relieved of that responsibility, and is no longer under any duty to protect the plaintiff. As to such express assumption of risk, see § 496 B.

2. A second, and closely related, meaning is that the plaintiff has entered voluntarily into some relation with the defendant which he knows to involve the risk, and so is regarded as tacitly or impliedly agreeing to relieve the defendant of responsibility, and to take his own chances. Thus a spectator entering a baseball park may be regarded as consenting that the players may proceed with the game without taking precautions to protect him from being hit by the ball. Again the legal result is that the defendant is relieved of his duty to the plaintiff. As to such implied assumption of risk, see § 496 C.

3. In a third type of situation the plaintiff, aware of a risk created by the negligence of the defendant, proceeds or continues voluntarily to encounter it. For example, an independent contractor who finds that he has been furnished by his employer with a machine which is in dangerous condition, and that the employer, after notice, has failed to repair it or to substitute another, may continue to work with the machine. He may not be negligent in doing so, since his decision may be an entirely reasonable one, because the risk is relatively slight in comparison with the utility of his own conduct; and he may even act with unusual caution because he is aware of the danger. The same policy of the common law which denies recovery to one who expressly consents to accept a risk will, however, prevent his recovery in such a case. As to such implied assumption of risk, see § 496 C. As to the necessity that the plaintiff's conduct be voluntary, see § 496 E.

4. To be distinguished from these three situations is the fourth, in which the plaintiff's conduct in voluntarily encountering a known risk is itself unreasonable, and amounts to contributory negligence. There is thus negligence on the part of both plaintiff and defendant; and the plaintiff is barred from recovery, not only by his implied consent to accept the risk, but also by the policy of the law which refuses to allow him to impose upon the defendant a loss for which his own negligence was in part responsible. (See § 467.)

At least two major problems arise when the doctrine is applied to this case. First, although it would seem that the "assumption of risk," if there is one, would arise under type 2 because of an apparently voluntary relation between appellant and the school district, coaches and other players which is fraught with known risks. However, the case might fit under type 3 as well. It might be said that appellant voluntarily proceeded to encounter a known danger created by the appellee's negligence. The confusion that results from this dual classification is that once the case is identified as belonging to type 2, there is a tendency not to question the voluntariness of the relationship, absent evidence of overt coercion, because the type 2 relationship itself is said to give rise to the assumption of risk.[3] On the surface, voluntariness seems to be assumed. Accordingly, once the case is categorized as a type 2 case, the analysis of voluntariness *seems* to be that if appellant voluntarily played football (i. e., if he voluntarily entered into a relationship with the school district), he voluntarily assumed the risk of injury due to playing football.

To show the fallacy of this view it is necessary to discuss a second major problem related to the practical application of the assumption of risk doctrine: the proper definition of

**3.** This type of analysis is articulated in Note, "Contributory Negligence and Assumption of Risk—The Case for Their Merger," 56 Minn.L.Rev. 47, 49 (1971). The fundamental elements of assumption of risk, type 2, according to the author of the Note, are:
> (1) the parties have entered into a voluntary relationship; (2) the plaintiff, by entering into this relationship, assumes the risks incidental to it; (3) the defendant has no duty with respect to these incidental risks—thus if plaintiff's injury arises from an incidental risk, defendant is not negligent because he did not breach a duty; (4) the conduct of plaintiff in encountering the particular risk is not relevant because he assumes the risk as a matter of law when he voluntarily enters into the relationship with the defendant—thus plaintiff assumes the risk even if his conduct is reasonable and even if he does not know or appreciate the particular risk at the time he encounters it.

We specifically reject this analysis (that plaintiff need not know or appreciate the risk) because of the general requirement of § 496 C and D that a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he knows of the existence of the risk and appreciates its unreasonable character.

"risk". What risk can appellant be said to have voluntarily assumed? One possibility is that he assumed the risk of all injuries related to training for and playing football. A second possibility is that he assumed the risk of all injuries related to training for and playing football while under the direction of coaches who furnished watchful supervision and protective equipment when needed.

It is apparent that when the risk is defined more narrowly, as we think it should be, the analysis of voluntariness changes. In order to voluntarily engage in any activity, one must know what the activity is and then decide, as a matter of choice, to participate. Appellant was familiar with varsity football and he voluntarily participated in it, but it does not follow that he voluntarily participated in jungle football if such participation was required to make the varsity team. The fact that appellant voluntarily tried to make the football team, therefore, has nothing to do with whether he voluntarily played jungle football. Another way to put this is that the voluntariness of appellant's act must be proximately related to the danger (or the risk) which caused the injury. Otherwise, the question of voluntariness, which is said to be at "the basis" of assumption of risk, Restatement § 496 E, comment a, would be avoided, for the only relevant voluntariness is voluntariness related to the risk. In this case, appellant's voluntary act was that he associated himself with an athletic program which was presumed to be competently and safely administered. It is at least a jury question whether appellant's voluntary association extended to the jungle football activity. And that question must be answered, for it was during the jungle football game that the injury occurred.

A similar problem arose in *Green v. Sanitary Scale Co.*, 431 F.2d 371 (3d Cir. 1970), where a sixteen year old boy, employed by a grocery to wrap and package meat, was injured when his hand was caught in the worm gear of a meat grinder. He had been directed to grind a piece of meat in the machine and had pushed the meat into the grinder with his hand because, according to his testimony,

the metal stomper was often not effective in pushing the meat into the worm gear. He had not been given instruction in the use of this machine and had not used it more than a few times during the course of his two-year employment. His testimony was that when he first tried to extract his hand from the funnel of the meat grinder, his hand was above the worm gear itself, but that he could not extract his hand and it was pulled into the worm gear as the meat went down.

The district court refused to give an instruction on assumption of risk and the case went to the jury on a contributory negligence defense. The jury awarded a verdict for the plaintiff and the defendant argued on appeal that the trial court's refusal to instruct on assumption of risk was error. The United States Court of Appeals for the Third Circuit reversed and awarded a new trial, holding that an instruction on assumption of risk should have been given. Judge Staley, in a strong dissent, argued that the trial court was not in error and that the majority's statement of the nature of the risk assumed did not comport with the proof. Citing the Restatement 2d § 496D, Judge Staley noted that: "[A] plaintiff does not assume a risk of harm arising from the defendant's conduct unless he knows of the existence of the risk and appreciates its unreasonable character." He then stated that the majority's definition of the risk assumed in this case as the danger that if one places one's hand in the worm gear, it will be injured. Judge Staley would have defined the risk as the danger that if one places one's hand in the funnel of the meat grinder, the hand will be drawn into the worm gear by the meat. He formulated the definition of risk this way because of plaintiff's testimony that while he was aware of the danger of putting his hand into the worm gear, he was unaware of the danger that the meat, once inserted into the machine, would catch his hand and draw it into the worm gear.

The *Green* case illustrates that the problem of defining risk is recurrent and that the way risk is defined affects the analysis of plaintiff's knowledge as well as the voluntariness

of his assuming the risk. Together, the present case and the *Green* case illustrate the difficulty courts have had in applying the doctrine to the cases before them. It seems probable in the present case that the lower courts did not recognize the importance and applicability of questions of voluntariness and knowledge, in part, because they did not properly define the risk. This may also have led to the erroneous exclusion of expert testimony, for once it is seen that the negligence of the coaches is related to the risk said to have been assumed, the relevance of the expert's testimony is clear.

▉▉▉ As one commentator has pointed out, the complexity of the doctrine may not be worth the difficulty it causes, for assumption of risk is duplicative of the more widely understood concepts of scope of duty and contributory negligence 2 Harper and James, The Law of Torts, § 21.8 at 1191 (1965). Justice Frankfurter, concurring in *Tiller v. Atlantic Coast Line Railroad Co., supra,* wrote:

> Because of its ambiguity the phrase "assumption of risk" is a hazardous legal tool. As a means of instructing a jury, it is bound to create confusion. It should therefore be discarded.

*Supra* at 72, 63 S.Ct. at 454–55. A similar idea was expressed by the Supreme Court of New Jersey, commenting on the ambiguity of the meanings of "assumption of risk":

> In *Meistrich v. Casino Arena* [31 N.J. 44, 155 A.2d 90] . . . we pointed out that assumption of the risk was theretofore used in two incongruous senses: in one sense it meant the defendant was not negligent, while in its other sense it meant the plaintiff was contributorily negligent. *We said that in truth there are but two issues— negligence and contributory negligence—both to be resolved by the standard of the reasonably prudent man,* and that it was erroneous to suggest to the jury that assumption of the risk was still another issue.
>
> It was our hope that after Meistrich the bench and bar would focus upon the true issues, but unhappily some cling to the terminology of assumption of risk and continue to

be misled by it even while purporting to think of it as merely a convertible equivalent of negligence or contributory negligence.

*McGrath v. American Cyanamid Co.*, 41 N.J. 272, 196 A.2d 238, 239–240 (N.J. 1963). (Emphasis supplied.) We agree that the difficulties of using the term "assumption of risk" outweigh the benefits. The issues should be limited to negligence and contributory negligence. Those are the problems in the case at bar and in all cases brought on a negligence theory. There is no need to introduce further complications. The policy reasons which once existed to preserve the doctrine because of its use in the master-servant cases no longer exist.[4] Furthermore, as is indicated in the *Pennsylvania Suggested Standard Jury Instructions*, "cases which have evoked the doctrine to deny plaintiff's recovery would have produced the same result either by (1) the court's determination that, as a matter of law, defendant owed plaintiff no duty, or, by (2) the jury's determination that plaintiff's own negligent conduct was a substantial factor in bringing about the harm he suffered." § 3.04 (1981).

■ For the reasons set out herein, we hold that except where specifically preserved by statute; or in cases of express assumption of risk, or cases brought under 402 A, (a strict liability theory), the doctrine of assumption of risk is abolished.[5] The order of the Superior Court is reversed, the

4. The Pennsylvania Workmen's Compensation Act has abolished assumption of risk as a defense. 77 P.S. § 41. The act covers most, but not all employees. 77 P.S. § 22 (Supp. 1981–1982).

5. We note that nineteen other jurisdictions have either seriously modified or abolished the assumption of risk doctrine. The list is as follows:

Alaska—*Leavitt v. Gillaspie*, 443 P.2d 61 (1968)

California—*Li v. Yellow Cab Co.*, 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975)

Delaware—see, *Frelick v. Homeopathic Hosp. Ass'n*, 1 Storey 568, 150 A.2d 17 (1959)

Hawaii—*Burrows v. Hawaiian Trust Co.*, 49 Haw. 351, 417 P.2d 816 (1966)

Idaho—*Fawcett v. Irby*, 92 Idaho 48, 436 P.2d 714 (1968)

Iowa—*Rosenau v. City of Estherville*, 199 N.W.2d 125 (1972)

motion to remove the compulsory nonsuit is granted, and the case is remanded to the Court of Common Pleas of Beaver County for proceedings not inconsistent with this Opinion.[6]

Kansas—*Smith v. Blakey*, 213 Kan. 91, 515 P.2d 1062 (1973) (except in master servant cases)

Kentucky—*Parker v. Redden*, 421 S.W.2d 586 (1967)

Michigan—*Felgner v. Anderson*, 375 Mich. 23, 133 N.W.2d 136 (1965)

Minnesota—*Springrose v. Willmore*, 292 Minn. 23, 192 N.W.2d 826 (1971)

New Hampshire—*Bolduc v. Crain*, 104 N.H. 163, 181 A.2d 641 (1962)

New Jersey—*McGrath v. American Cyanamid Co.*, 41 N.J. 272, 196 A.2d 238 (1963); *Meistrich v. Casino Arena Attractions, Inc.*, 31 N.J. 44, 155 A.2d 90 (1959)

New Mexico—*Williamson v. Smith*, 83 N.M. 336, 491 P.2d 1147 (1971)

North Carolina—*McWilliams v. Parham*, 269 N.C. 162, 152 S.E.2d 117 (1967)

Oregon—*Ritter v. Beals*, 225 Or. 504, 358 P.2d 1080 (1961)

Texas—*Farley v. M M Cattle Co.*, 529 S.W.2d 751 (1975)

Washington—*Feigenbaum v. Brink*, 66 Wash.2d 125, 401 P.2d 642 (1965); *Lyons v. Redding Construction Co.*, 83 Wash.2d 86, 515 P.2d 821 (1973)

Wisconsin—*McConville v. State Farm Mutual Automobile Insurance Co.*, 15 Wis.2d 374, 113 N.W.2d 14 (1962); *Gilson v. Drees Bros.*, 19 Wis.2d 252, 120 N.W.2d 63 (1963)

Wyoming—*Ford Motor Co. v. Arguello*, 382 P.2d 886 (1963)

6. We note that the abolition of the doctrine of assumption of risk is even more appropriate in view of the Pennsylvania comparative negligence statute, 42 Pa.C.S.A. § 7102, which was adopted subsequent to this case and which provides:

(a) General rule.—In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

(b) Recovery against joint defendant; contribution.—Where recovery is allowed against more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal negligence to the amount of causal negligence attributed to all defendants against whom recovery is allowed. The plaintiff may recover the full amount of the allowed recovery from any defendant against whom the plaintiff is not barred from recovery. Any

defendant who is so compelled to pay more than his percentage share may seek contribution.

    (c) Downhill skiing.—

    (1) The General Assembly finds that the sport of downhill skiing is practiced by a large number of citizens of this Commonwealth and also attracts to this Commonwealth large numbers of nonresidents significantly contributing to the economy of this Commonwealth. It is recognized that as in some other sports, there are inherent risks in the sport of downhill skiing.

    (2) The doctrine of voluntary assumption of risk as it applies to downhill skiing injuries and damages is not modified by subsections (a) and (b).

For the further reasons that follow, we conclude that the continuation of the doctrine of assumption of risk is inappropriate in a context of comparative negligence.

We have already seen that the complexity of the doctrine and the difficulty of its application is a significant problem. Additionally, we have considered the four types of assumption of risk enumerated at Restatement § 496 A, comment c, 1–4, *supra*, and have concluded that types 2, 3, and 4 should be abolished. At least as to type 4 cases, where assumption of risk coincides with contributory negligence, application of the doctrine operates to frustrate the very result that the comparative negligence statute was designed to achieve. The California Supreme Court, writing on this problem, has stated:

    [T]he adoption of a system of comparative negligence should entail the merger of the defense of assumption of risk into the general scheme of assessment of liability in proportion to fault in those particular cases in which the form of assumption of risk involved is no more than a variant of contributory negligence.

*Li v. Yellow Cab*, 13 Cal.3d 804, 825, 119 Cal.Rptr. 858, 532 P.2d 1226, 1241 (1975). Dean Prosser, writing on the same subject, stated that retention of the assumption of risk defense after legislative adoption of comparative negligence:

    in all probability . . . defeats the basic intention of the statute, since it continues an absolute bar in the case of one important, and very common, type of negligent conduct on the part of the plaintiff. It can scarcely be supposed in reason that the legislature has intended to allow a partial recovery to the plaintiff who has been so negligent as not to discover his peril at all, and deny it to one who has at least exercised proper care in that respect, but has made a mistake of judgment in proceeding to encounter the danger after it is known.

Prosser at 457 (4th ed. 1971).

As to type 4, we are of the opinion that its continued viability in Pennsylvania is incompatible with the legislative policy of recovery based on fault that is reflected in the comparative negligence statute.

Types 2 and 3 concern implied voluntary assumptions of a known risk. The implication that a risk has been assumed arises in type 2 by operation of law as a consequence of the relation entered into between plaintiff and defendant. The legal consequence of such a relationship, e. g., when a patron pays to attend a baseball game, is that the defendant is relieved of duty as to the plaintiff. In type 3, the implication of voluntary assumption arises when the plaintiff,

O'BRIEN, J., concurs in the result.

ROBERTS, J., files a dissenting opinion in which WIL-KINSON, J., joins.

NIX, J., files a dissenting opinion in which WILKINSON, J., joins.

ROBERTS, Justice, dissenting.

I dissent.

A review of the record demonstrates that appellant has failed to sustain his burden on the issue of proximate cause. Even assuming that appellees breached some duty, appellant has presented no evidence from which a jury could reasonably conclude that any alleged breach of duty by appellee was responsible for appellant's injury. As this Court has stated,

> "[I]t remains a principle so fundamental as to require no authority that the mere existence of negligence and the occurrence of injury are insufficient to impose liability upon anyone. There remains to be proved the vitally important link of causation. And plaintiff has the burden of proving this link, that the defendant's negligence was the proximate cause of her injury; or of proving evidence from which a reasonable inference arises that the defendant's negligence was the proximate cause of the injury."

aware of a risk created by the negligence of defendant, voluntarily proceeds or continues to encounter it.

As is indicated in § 496 C, comment g, the implicit decision to assume the risk can be either reasonable or unreasonable. Since the Pennsylvania comparative negligence statute is designed to apportion liability on the basis of fault, not to bar plaintiff's recovery if it can be shown that he had any degree of fault at all, the absolute bar to plaintiff's recovery effected by the application of types 2 and 3, without regard to the reasonableness of plaintiff's action, tends to frustrate the purpose of the comparative negligence statute. Assumption of risk, types 2, 3 and 4, therefore, which act as a complete bar to recovery, regardless of the reasonableness of plaintiff's behavior, are incompatible with our comparative negligence statute and should be abolished for this reason as well as for the other reasons given.

*Cuthbert v. Philadelphia*, 417 Pa. 610, 614, 209 A.2d 261, 263 (1965) (citations omitted).[1]

It is equally well settled that "where the evidence in a case affords no greater basis for a jury's verdict than a guess or conjecture, the evidence is legally insufficient to support a verdict, and the case must be withdrawn." 6 Std. Pa. Practice Ch. 25 § 21, p. 272. Here, on the evidence presented, the jury could do no more than guess at whether protective equipment, increased supervision, or improved lighting would have prevented the particular injury received by appellant.

Because appellant has not carried his burden of proof on the issue of proximate cause, it is unnecessary to address the applicability of the affirmative defense of assumption of risk to this case, let alone attempt to decide the continuing viability of a doctrine which has not previously been questioned by this Court. See, e. g., *Jones v. Three Rivers Management Corp.*, 483 Pa. 75, 394 A.2d 546 (1978).[2]

The trial court's granting of a compulsory nonsuit was correct and, thus, the order of the Superior Court upholding the nonsuit should be affirmed.

WILKINSON, J., joins in this dissenting opinion.

NIX, Justice, dissenting.

The majority in this case has unnecessarily complicated a doctrine which admittedly is retained by a majority of our sister states. Although certain authorities have questioned the validity of assumption of risk doctrine, I believe this doctrine constitutes a necessary and viable component of tort law. Notwithstanding the fact assumption of risk and

1. While the testimony of appellant's expert witness might have been relevant to the issue of appellees' duty, his testimony would not have shed any light on the issue of proximate cause.

2. Because only three of the seven members of this Court participating in this decision would abrogate assumption of risk, assumption of risk remains the law of this Commonwealth, see *Mt. Lebanon v. County Board of Elections*, 470 Pa. 317, 322–323, 368 A.2d 648, 650–651 (1977), and thus is available to the defendants on remand.

contributory negligence may overlap in some areas, they are two separate and distinct defenses. Assumption of the risk is based on the theory that there has been a voluntary acceptance of risk and such acceptance, whether express or implied, requires knowledge and appreciation of the risk. Contributory negligence on the other hand is a matter of some fault or departure from the standard of reasonable conduct.

One distinction between assumption of risk and contributory negligence is that contributory negligence is itself a proximate cause of the injury complained of, while assumption of risk will bar a recovery even though it plays no part in the causation of the accident except the voluntary exposure to danger with actual knowledge of the dangerous condition. 82 A.L.R.2d 1231 (1962).

An example of where assumption of risk is applicable and contributory negligence is not is found in *Schentzel v. Philadelphia National League Club*, 173 Pa.Super. 179, 96 A.2d 181 (1953). In *Schentzel* there was not direct evidence that plaintiff, a 47-year-old woman, knew that baseball players hit foul balls which go astray and may injure spectators. The court, however, reversed a judgment in her favor, finding "she must have assumed such a risk," because "she must be presumed to have been cognizant of the "neighborhood knowledge" with which individuals living in organized society are normally equipped.

The benchmark of negligence is conduct expected of the proverbial reasonable man. To erode this concept and carve an exception in the area of the defense of assumption of risk serves no purpose and in effect throws the entire one out of kilter. An objective standard must necessarily be applied in assumption of risk cases to avoid placing an unreasonable burden on defendant to prove plaintiff's state of mind. The difficulties created by the use of a subjective standard has been commented on by Dean Prosser.[1]

1. The standard to be applied is, in theory at least, a subjective one, geared to the particular plaintiff and his situation, rather than that of the reasonable man of ordinary prudence who appears in contributo-

Under an objective standard in this case, it is clear that the record reflects that a reasonable individual in the plaintiff's situation was aware of the dangers inherent upon his participation and voluntarily assured the risk. Appellant had played football on the school team in two previous years and was a starter on the team in the year of the accident. Appellant had also played jungle football during those previous years. Clearly, appellant had to be aware of the potential dangers of playing jungle football and could very easily have chosen not to continue to participate in playing the game. Because of his prior experience and knowledge of the inherent dangers of such contact sports, the only logical conclusion would be that appellant was not only aware of the risks but voluntarily assumed those risks.

The question of duress introduced by the majority is, in my judgment, a red herring. Obviously the risks of jungle football were no greater than the risks involved in the general football program. Having committed himself voluntarily to participation in this area, he cannot now be heard to attempt to isolate one segment from the general exposure that he had voluntarily committed himself to be exposed to.

WILKINSON, J., joined in this opinion.

ry negligence. If because of age or lack of information or experience, he does not comprehend the risk involved in a known situation, he will not be taken to consent to assume it. His failure to exercise ordinary care to discover the danger of risk, but of the defense of contributory negligence.

At the same time, it is evident that a purely subjective standard opens a very wide door for the plaintiff who is willing to testify that he did not know or understand the risk; and there have been a good many cases in which the courts have said in effect that he is not to be believed, so that in effect something of an objective element enters the case, and *the standard applied in fact does not differ greatly from that of the reasonable man.* The plaintiff will not be heard to say that he did not comprehend a risk which must have been quite clear and obvious to him. There are some things, as for example the risk of injury if one is hit by a baseball driven on a line, which are so far a matter of common knowledge in the community, that in the absence of some satisfactory explanation a denial of such knowledge simply is not to be believed.

W. Prosser, Handbook of the Law of Torts § 68 (3d ed. 1964).