## Missar v. Camelback Ski Resort

*Stanton A. Berkowitz*, for plaintiff.
*Hugh M. Emory*, for defendant.

WILLIAMS, *S.J.*, August 3, 1984 — In this Trespass action, brought by plaintiff, Michael J. Missar, against defendant, Camelback Ski Resort (resort),

to recover for injuries sustained while skiing at the resort, defendant has presented the instant motion for summary judgment. In the complaint, it is alleged that plaintiff fell and was injured while skiing at the resort on February 6, 1982 as the result, inter alia, of defendant's failure to note worsening weather conditions and either to warn plaintiff and other skiers of the dangers involved or to close the skiing area when they became unsafe for skiing. Defendant filed an answer with new matter averring that plaintiff's claim is barred by his assumption of the risk, and that plaintiff was skiing at the resort by virture of having purchased a "lift ticket" containing language which exculpated defendant. A specimen ticket stub was attached as "Exhibit A", and William Stevenson, General Manger of the Camelback Ski Area, filed an Affidavit that this was the only type of lift ticket which would have been sold to plaintiff on February 6, 1982. Plaintiff filed a reply to new matter denying knowledge that the language of the ticket which he purchased was identical with that of the copies presented, and demanding strict proof at trial. The deposition of plaintiff was taken on August 24, 1983. If plaintiff is bound by this disclaimer, we need go no farther; if not, it will be necessary to examine other evidence which may demonstrate assumption of the risk.

## I. THE EXCULPATORY DISCLAIMER

Upon arrival at the resort before noon, February 6, 1982, plaintiff purchased as afternoon ski lift ticket — good from noon to five o'clock — of the type then being sold generally to other skiers at the Resort (Complaint, Par. 6; Deposition, page 30, page 34; Affidavit of William Stevenson). At the top of the ticket stub, there was printed in large characters the logo: "CAMELBACK": below that, in nine point

Bourgeois bold face capitals: "NO REFUND — NO TRANSFER"; and below that, in 5 point Pearl type face:[*]

"The purchaser and user of this ticket assumes and understands that skiing is a hazardous sport, that bare spots, variations in snow, ice and terrain along with bumps, moguls, stumps, forest growth and debris and rocks and many other hazards or obstacles exist within this ski area in using the ticket and skiing in the area, such dangers are recognized and accepted whether they are marked or unmarked. The skier realizes that falls and collisions do occur and injuries may result, and therefore assumes the burden of skiing under control at all times."

Generally, exculpatory disclaimers between private parties are enforceable in Pennsylvania and are not viewed as violating public policy. In Grbac v. Reading Fair Company, Inc., 521 F. Supp. 1351, 1355 (W.D. Pa., 1981), Michael Grbac sustained fatal injuries on October 29, 1978 while driving in the Schmidt's 200 Stock Car Race at the Reading Fairgrounds, Reading, Pa. Prior to participating, Grbac had signed an agreement releasing the Promoters, Racing Association, Track Owner, Landowner, their officers and employees from liability for injuries to person or property sustained while the undersigned is upon the "Restricted Area". Grbac's wife filed a wrongful death and survival action against the Reading Fair Company and other defendants. The District Court granted defendants' motion for summary judgment by reason of the release. District Judge Cohill applied the four-point test of

---

[*]See the sample specimens of type face published in Webster's New International Dictionary (2nd Ed., Unabridged) at page 2750.

the validity and enforceability of exculpatory re-
leases formulated by the Pennsylvania Superior
Court in Zimmer v. Mitchell and Ness, 253 Pa. Su-
per. 474, 385 A.2d 437 (1978), affirmed Per Curiam
in 490 Pa. 428, 416 A.2d 1010 (1980), and said:

"First, just as an exculpatory clause in a ski rental
agreement does not violate public policy, a release
in an agreement concerning participation in an
automobile race does not contravene any policy of
the law. Such a release has very little, if any, nega-
tive impact on the general population. Moreover,
fewer promoters would be willing to hold auto-
mobile races if courts refused to permit them to lim-
it their exposure to liability for racetrack accidents,
in what is undeniably a dangerous sport. Second,
this case does not involve a utility or other quasi-
public entity that supplies essential services. Rath-
er, the agreement unquestionably relates to the pri-
vate affairs of individuals. Third, Mr. Grbac
participated in automobile races as a form of recrea-
tion. His livelihood did not depend on racing, and he
was under no compulsion to enter the Schmidt's
200. Finally, the document that Mr. Grbac signed
specifically expresses the intent of the parties to re-
lease the defendants from any liability for personal
injury . . ."

On appeal, this decision was affirmed by the Circuit
Court of Appeals: 688 F.2d 215 (3d. Cir., 1982).

While the substance of the exculpatory disclaim-
er contravenes no public policy, there is a further
question whether the form in which it has been
stated is such that public policy would permit en-
forcement against plaintiff under the circumstances
of this case. Here, there is no evidence that plaintiff
signed any document — as the injured driver did in
Grbac, supra — and plaintiff has denied having read
the disclaimer. He testified:

"Q. Did you read the lift ticket, do you remember?

"A. Just put them on your jacket, that's all, so you get up the lift. We don't usually read them.

"Q. Well, do you remember if you did read it?

"A. No. I don't think I did.

"Q. Have you ever read a lift ticket?

"A. No, not that I remember.

• • •

"Q. Can you read the lift ticket?

"A. No, I can't read that. No, I can't read that; no.

"Q. Why can't you? Your eyes aren't good or . . . .

• • •

"A. I can't. Maybe my eyes aren't that good, and maybe it's too small.

"Ms. Lodov: Well, with my nose up to it, with my nose on the paper."

(Deposition, pages 18, 19.)

Some authority may be found for charging a party with an exculpatory disclaimer which he has signed but failed to read: Broderson v. Rainier National Park Co., 60 P. 2d 234, 236 (Supreme Court of Washington, 1936). There, plaintiff was injured while tobogganing upon a slide operated by defendant. At the conclusion of the trial, the lower court dismissed the action on the ground that plaintiff had signed a waiver of liability. On appeal, the Supreme Court affirmed. The Supreme Court also rejected plaintiff's contention that the exculpatory disclaimer was void, as contrary to public policy.

Thirty-five years later, after the State of Washington had adopted the Uniform Commercial Code, a case arose which was indistinguishable from Broderson: Baker v. City of Seattle, et al., 79 Wash. 2d 198, _____, 484 P. 2d 405, 406, 407 (Supreme Court of Washington, 1971). There, plaintiff went

to play golf on a municipal course owned by the City of Seattle. He rented a cart from defendant Westweld Metal Works, and signed a printed form denominated "Golf Cart Rental Agreement" which contained an exculpatory clause. Plaintiff was injured while returning the cart when, allegedly, the brakes failed and the cart overturned. The trial court granted defendants' motion for summary judgment and the court of appeals affirmed. On further appeal, the Supreme Court — taking cognizance of a public policy directed to the style in which exculpatory agreements are set forth, as expressed in the Uniform Commercial Code — reversed the judgment and remanded the case for trial. Associate Justice Wright said:

"Although many references are made to 'fine point,' the disclaimer of liability is exactly the same size print as the body of the golf cart rental agreement. The disclaimer, about in the middle of the agreement, would have been observed only by reading the entire agreement.

•   •   •

"We held in Broderson v. Rainier National Park Co., 187 Wash. 399, 60 P. 2d 234 (1936), that such an agreement was valid. The Broderson case cannot be distinguished from the case at bar. The trial court relied on Broderson in granting a summary judgment of dismissal on the basis of the disclaimer clause in the rental agreement. The Court of Appeals relied on Broderson in affirming, 2 Wash. App. 1003, 471 P. 2d 693 (1970).

"We now hold Broderson v. Rainier National Park Co., supra, must be and is hereby expressly overruled, insofar as it holds a plaintiff who has unwittingly signed, 'is not thereby relieved from the consequences of his act.'

•   •   •

The legislature of this state has announced a public policy with regard to disclaimers of liability in commercial transactions by enacting the Uniform Commercial Code, particularly RCW 62 A. 2-316 (2) and RCW 62 A. 2-179 (1), (3) . . . .

"In the instant case, the disclaimer was contained in the middle of the agreement and was not *conspicuous*. To allow the respondent to completely exclude himself from liability by such an inconspicuous disclaimer, would be truly unconscionable." (Emphasis supplied.)

Pennsylvania, like the State of Washington, has adopted the Uniform Commercial Code. Here, the sections cited in Baker, supra, are found respectively in 13 Pa. C.S. §2316 (b) and 2719. They provide:

"Sec. 2316. Exclusion or modification of warranties

. . .

"(b) Implied warranties or merchantability and fitness. — Subject to subsection (c), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing *must be conspicuous*, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and *conspicuous*. . . ." (Emphasis supplied.)

"Sec. 2719. Contractual modification or limitation of remedy

"(a) General rule. — Subject to the provisions of subsections (b) and (c) and of section 2718 (relating to liquidation or limitation of damages; deposits):

. . .

"(c) Limitation of consequential damages. — Consequential damages may be limited or excluded unless the limitation or exclusion is *unconscionable*. Limitation of consequential damages for injury to the person in the case of consumer goods is prima

facie unconscionable but limitation of damages where the loss is commercial is not." (Emphasis supplied.)

In addition, we call attention to two other Sections of the Code which were not cited by the court in Baker:
"Sec. 1201. General definitions

• • •

" 'Conspicuous.' A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it.

"A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is conspicuous.

"Language in the body of a form is conspicuous if it is in larger or contrasting type or color. But in a telegram, any stated term is conspicuous.

"Whether a term or clause is conspicuous or not is for decision by the court."

"Section 2302. Unconscionable contract or clause

"(a) Finding and authority of court. — If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made, the court may:

(1) refuse to enforce the contract;

(2) enforce the contract without the unconscionable clause; or

(3) so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(b) Evidence by parties. — When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

The exculpatory disclaimer in the instant case — Although the substance of it violates no public policy — does violate the public policy, reflected in the Uniform Commercial Code, which requires exculpatory clauses to be set forth clearly and conspicuously, with proper emphasis to engage the attention of a reasonable person. The heading in capital letters, "NO REFUND — NO TRANSFER", gave not the slightest hint that the material which followed contained language of an exculpatory nature. That material was printed in small type (five point Pearl) which was difficult, although not impossible, to read. Furthermore, the exculpatory disclaimer was not rendered "conspicuous" by printing in larger or contrasting type of color. This is in significant contrast to the enforceable contract found in Grbac v. Reading Fair Company, Inc., supra, which contained language in capital letters: "Hereby Releases, Waives, Discharges and Covenants Not to Sue the Promoters . . ." and "Hereby Agrees to Indemnify and Hold Harmless the Releasees. . . ." Plaintiff's testimony at deposition that he was unable to read the exculpatory disclaimer was elicited in response to questions by counsel for defendant, and no contradictory evidence was presented (Deposition, page 39). Accordingly, we find that this exculpatory disclaimer is unconscionable and therefore unenforceable against plaintiff.

## II. OTHER EVIDENCE OF ASSUMPTION OF THE RISK

The continuing vitality of the assumption of risk doctrine was brought into question by the introduction of Comparative Negligence, for the first time in Pennsylvania, by the Act of April 28, 1978, P.L. 202 (No. 53), 42 Pa. C.S. §7102. Independently of that act, however, the Pennsylvania Supreme Court

moved in the direction of abolishing the doctrine: Rutter v. Northeastern Beaver County School District, 496 Pa. 590, 613, 437 A.2d 1198, 1209 (1981). There Mr. Justice Flaherty — joined by Mr. Justice Larsen and Mr. Justice Kauffman, with Chief Justice O'Brien concurring in the result and Mr. Justice (later, Chief Justice) Roberts and Mr. Justice (later, Chief Justice) Nix, dissenting (see: Carrender v. Fitterer, ____ Pa. ____, 469 A. 120, Footnote 6 at page 125) — said:

"For the reasons set out herein, we hold that *except where specifically preserved by statute; or in* cases of express assumption of risk, or cases brought under 402 A. (a strict liability theory), the doctrine of assumption of risk is abolished[5] [Footnote omitted]." (Emphasis supplied.)

In Vargus v. Pitman Manufacturing Company, 675 F.2d 73, 74, 75, (3d Cir., 1982), Circuit Judge Aldisert noted that the lead opinion in Rutter, supra, since it was not joined by a majority of the court, is not a binding precedent. In the year prior to the Rutter decision, the legislature had passed the "Skiing Responsibility Act" of March 27, 1980, P.L. 52 (No. 19), effective immediately. This act was repealed by Section 222 of the JARA Continuation Act of October 5, 1980, P.L. 693 (No. 142), and its substance was codified as subsection "c" of the Comparative Negligence Law, 42 Pa. C.S. §7102 (c), which provides:

"(c) Downhill skiing.—

"(1) The General Assembly finds that the sport of downhill skiing is practiced by a large number of citizens of this Commonwealth and also attracts to this Commonwealth large numbers of nonresidents significantly contributing to the economy of this Commonwealth. It is recognized that as in some

other sports, there are inherent risks in the sport of downhill skiing.

"(2) The doctrine of voluntary assumption of risk as it applies to downhill skiing injuries and damages is not modified by subsections (a) and (b)." Subsection (c) is directly applicable to the instant accident, which occurred on February 6, 1982.

The only decision applying subsection (c) which we have found is Smith v. Seven Springs Farm, Inc., 716 F.2d 1002, 1005, 1007, 1009 (3rd Cir., 1983). There, the circuit court affirmed summary judgment for defendant on the ground that plaintiff had assumed the risk as a matter of law. Plaintiff had over 13 years of experience in skiing and considered himself an advanced intermediate skier. On February 2, 1980, he skied at Seven Springs for the first time. He went to the top of the mountain to ski the North Face, a trail consisting of two gentle slopes with a headwall in between. Having noted a sign at the beginning of the trial marked with the black diamond symbol and the words "Most Difficult", he took this rather than an available less difficult trial. He was aware that the headwall was icy and that other skiers ahead were having trouble negotiating the steep slope. He also was aware that a series of poles, part of the snowmaking apparatus, lined the center of the headwall. In the course of an unsuccessful maneuver, he fell, lost his skis, slid into a pole and two snowmaking pipes, sustaining serious and permanent injury to his right knee. Circuit Judge Aldisert said:

"It may be that plaintiff's conduct in voluntarily encountering a known risk was reasonable. If so, the defense of assumption of risk in its *primary sense* operates to deny the defendant's negligence by denying the duty of care element of that offense; plaintiff does not recover because defendant's con-

duct is not a legal wrong as to him [citations omitted]. But if plaintiff's conduct was *unreasonable* (Emphasis in the original), the defense of assumption of risk in its *secondary sense* operates to bar his recovery for two reasons — because he implicitly consented to accept the risk, and on policy grounds that it would be inappropriate to impose on the defendant a loss for which plaintiff's own negligence was in part responsible (Citations omitted).

"The overall focus of Sec. 7102 is to abolish the defense of contributory negligence in favor of a system of comparative negligence. But the statute manifests a specific intention on the part of the Pennsylvania legislature, in Sec. 7102 (c), to preserve the defense of assumption of risk in downhill skiing cases. We must determine, therefore, what effect, if any, the move to a system based on comparative fault has had on the assumption of risk defense preserved by the downhill skiing amendment. Specifically, we must decide whether the amendment contemplates the continued availability of both the defense of assumption of risk in its *primary sense* and the defense of assumption of risk in its *secondary sense.*

• • •

" . . . . To prevent potentially anomalous results and further the merger already begun at common law, we therefore read Sec. 7102 (c) to preserve only the defense of assumption of risk in its *primary sense* in downhill skiing cases[4] (Footnote omitted).

• • •

"Smith's own deposition . . . provided the district court with all the information it needed to conclude that, as a matter of law, Smith assumed the risk of injury and thereby discharged Seven Springs from any duty of care to him. Smith's testimony shows that he *subjectively appreciated* the risks of skiing

North Face and *voluntarily chose* to confront them . . . Such action, although confronting a known risk, was probably quite *reasonable* in light of his extensive skiing experience and ability. But in electing to pursue that course, Smith absolved defendant of any obligation to exercise care for his protection.

"Neither party presented evidence to contradict Smith's testimony. Giving his testimony the maximum consideration as we must do in a summary judgment contest, there was nothing further for a fact-finder to construe in Smith's favor to overcome the damage done by his own statements. We conclude, therefore, that reasonable minds could not differ over the question of assumption of risk presented. Accordingly, we uphold the district court's summary judgment ruling in favor of Seven Springs." (Emphasis supplied.)

In the instant case, the uncontradicted evidence was derived exclusively from plaintiff's own testimony on deposition. We find that it establishes each of the three elements relied upon in the Smith decision, supra. First, plaintiff's confrontation of the risks was *reasonable* in view of his prior experience as a skier.

He testified:

"Q. Have you skied at other areas in the Poconos?

"A. Yes.

"Q. What other areas?

"A. Jack Frost, Boulder.

"Q. About how many times at those two?

"A. Three or four times each one, I guess.

"Q. Any other places in the Poconos?

"A. That's about it.

"Q. What about in other areas; any other ski areas you've been to?

"A. In the country, you mean?

"Q. Yes.

"A. Ski Mountain in Duluth, Minnesota. A couple of other areas in Minnesota. I forget the names of them, the ski lodge, but it was several of them.

"Q. Did you live in Minnesota at some point?

"A. At the time, yes.

"Q. When was that?

"A. '77-'78.

"Q. When did you first start skiing?

"A. I guess in '76."

Second, plaintiff appreciated the risks of skiing. He testified:

"Q. Before the Camelback accident in February of '82 had you ever been injured skiing?

"A. No.

"Q. Had you ever seen people suffer injuries while you've been skiing?

"A. Yes.

"Q. Had you ever seen people suffer what appeared to be fractures of either . . . .

"A. Oh, yes.

"Q. Can you give me an idea as to how many times you may have seen that before the accident?

"A. Well, Camelback you see them all the time. Just go up there some weekend."

Third, plaintiff voluntarily confronted these known risks when he purchased a ski lift ticket and engaged in skiing at Camelback for the greater part of the afternoon of February 6, 1982.

On the authority of Smith v. Seven Springs Farm, Inc., supra, we conclude that plaintiff assumed the risk of the injury when he sustained and that defendant's motion for summary judgment must be granted.

## ORDER

And now, this August 3, 1984, it is ordered that defendant's motion is granted, and summary judgment for defendant, Camelback Ski Resort is entered.

