J-A12003-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| ex rel. UNITED EXPRESS JEWELRY | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | |
| (COMMISSION, POLICE DEPARTMENT) | : | |
| | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| ex rel. MOHAMMED SAFA | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | |
| (COMMISSION, POLICE DEPARTMENT) | : | |
| | : | |
| APPEAL OF: | : | |
| UNITED EXPRESS JEWELRY | : | No. 1853 EDA 2013 |

Appeal from the Order Entered April 30, 2013,
In the Court of Common Pleas of Philadelphia County, Criminal Division,
at Nos. CP-51-MD-00001440-2012 and CP-51-MD-0007545-2011.

BEFORE: SHOGAN, STABILE and PLATT*, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JULY 31, 2014**

Appellant, United Express Jewelry, appeals from the order denying its motion for the return of property filed pursuant to Pa.R.Crim.P. 588. We affirm.

We summarize the history of this case as follows. Mr. Safa and his brother own a jewelry store in Philadelphia. Some of their jewelry inventory is on consignment from jewelry wholesalers. In June of 2011, a Philadelphia

_____
*Retired Senior Judge assigned to the Superior Court.

Police Detective arrived at Mr. Safa's store stating that individuals from various jewelry wholesale companies were outside of the business seeking money and the detective offered Mr. Safa a "deal" to pay off a portion of the money allegedly owed to the wholesalers. Mr. Safa indicated to the detective that he owed no debt and refused to pay. Subsequently, the detective returned to Mr. Safa's store with a search warrant and eight individuals. The individuals then chaotically began grabbing various items located within the store. All of the items were allegedly placed into evidence. The City of Philadelphia considered prosecuting Mr. Safa for receipt/possession of stolen goods, but the charges were dropped.

Subsequently, three New York based jewelry wholesalers filed dueling motions for return of property, each claiming ownership of items taken from Mr. Safa's store. On February 15, 2012, United Express Jewelry filed a motion for return of property. On May 29, 2012, Yellow Gold filed a motion for return of property. On May 29, 2012, Italy in Gold Star filed a motion for return of property. In addition, Mr. Safa filed a motion for return of property, alleging that he was the true and real owner of the subject items confiscated from his jewelry store on June 17, 2011.

On April 24, and April 30, 2013, the trial court held a return-of-property hearing. Ultimately, the trial court determined that the confiscated items taken from Mr. Safa's store were neither contraband, derivative

contraband, nor stolen property. The trial court further determined that Mr. Safa and his store were the rightful owners of the items. On April 30, 2013, Mr. Safa's Motion for Return of Property was granted in its entirety, without conditions, and as against the other parties, United Express Jewelry, Yellow Gold, and Italy in Gold Star. Pursuant to the trial court's order, the subject items were to be returned in their entirety to Mr. Safa and his store. The motions filed by United Express Jewelry, Yellow Gold, and Italy in Gold Star were denied. This appeal by United Express Jewelry followed.

United Express Jewelry presents the following issues for our review:

1. Did not the trial court abuse its discretion and commit reversible error by ruling that Max Weiner, proposed witness of United Express Jewelry, was not qualified as an expert in the field of jewelry design, manufacture, and wholesale distribution.

2. In that it was offered that proposed expert witness Max Weiner would have testified to the contrary of Imad Safa and consistent with United Express Jewelry principal Gabriel Nisanov, that the jewelry identifying numbers on the transaction contemporaneous United Express Jewelry marketing records (memorandum, invoices, etc.) referred to manufacturer specific model/design/style numbers and not industry generic style numbers, consistent with industry practices, a critical factual issue was not the proposed expert testimony material, and its exclusion an abuse of discretion, constituting reversible error.

Appellant's Brief at 3-4 (verbatim).

Initially, we observe that United Express Jewelry's brief does not comply with Pennsylvania Rule of Appellate Procedure 2119, which provides, in pertinent part, as follows:

> **(a) General rule.  The argument shall be divided into as many parts as there are questions to be argued**; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

Pa.R.A.P. 2119(a) (emphasis added).  The argument portion of United Express Jewelry's brief is not divided into as many parts as there are questions to be argued because the argument portion is divided into three distinctive parts, yet United Express Jewelry lists a total of two issues in its "statement of the questions presented."  Because each of the three points raised by United Express Jewelry in the argument portion of its appellate brief and each of the two issues presented in its "statement of the questions presented" essentially challenge whether the trial court properly ruled that Max Weiner, the proposed expert proffered by United Express Jewelry, was not qualified to testify as an expert witness, we will consider United Express Jewelry's claims as a single issue.

As a prefatory matter, we observe that the standard of review applied in cases involving motions for the return of property is an abuse of discretion.  ***Commonwealth v. Durham***, 9 A.3d 641, 645 (Pa. Super. 2010) (citing ***Beaston v. Ebersole***, 986 A.2d 876 (Pa. Super. 2009) (*en banc*)).  Likewise, the decision to admit or exclude evidence is committed to the trial court's sound discretion and its evidentiary rulings will only be

reversed upon a showing that it abused that discretion. **Commonwealth v. Laird**, 988 A.2d 618, 636 (Pa. 2010).

Expert testimony may be admitted "[i]f scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" Pa.R.E. 702. Similarly, the admission of expert testimony is a matter of discretion for the trial court and will not be remanded, overruled, or disturbed unless there was a clear abuse of discretion. **Commonwealth v. Brewer**, 876 A.2d 1029, 1035 (Pa. Super. 2005). A finding of abuse of discretion may not be made "merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." **Laird**, 988 A.2d at 636 (quoting **Commonwealth v. Sherwood**, 982 A.2d 483, 495 (Pa. 2009)).

We have reviewed the briefs of the parties, the relevant law, the certified record before us on appeal, and the trial court's extensive opinion. Upon review, it is our determination that United Express Jewelry has failed to establish that the trial court abused its discretion in this matter. Rather, we agree with the trial court's analysis as to this matter and conclude that the trial court did not abuse its discretion in refusing to admit this evidence from the proffered expert witness. Hence, because the trial court's opinion

adequately disposes of the issue presented, we affirm the trial court's decision on the basis of its well-reasoned discussion with regard to United Express Jewelry's claim. Trial Court Opinion, 8/26/13, at 16-19.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/31/2014

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

**FILED**

AUG 2 9 2013

Criminal Appeals Unit
First Judicial District of PA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | |
| Ex. rel. United Express Jewelry | : | |
| Appellant | : | |
| | : | |
| | : | 1,853 EDA 2013 |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | |
| (Commission, Police Department) | : | |
| Appellee | : | CP-51-MD-0001440-2012/ |
| and | : | CP-51-MD-0007545-2011 |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA | : | |
| Ex. rel. Mohammed Safa | : | |
| Appellee | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | |
| (Commission, Police Department) | : | |
| Appellee | : | |

OPINION

Patrick, J.                                    DATE: August 26, 2013

Appellant, United Express Jewelry, appeals this Court's Order of April 30, 2013, denying

its Motion for Return of Property brought pursuant to PA. R. CRIM. P. 588.[1]  This Court now

---

[1] PA. R. CRIM. P. 588 provides, in relevant part, as follows:

(A) A person aggrieved by a search and seizure, whether or not executed pursuant to a
warrant, may move for the return of property on the ground that he or she is entitled to
lawful possession thereof.  Such motion shall be filed in the court of common pleas for
the judicial district in which the property was    seized.

(B) The judge hearing such motion shall receive evidence on any issue of fact necessary
to the decision  thereon. If the motion is granted, the property shall be restored unless the

1

submits the following Opinion in support of its ruling and in accordance with the requirements of PA. R.A.P. 1925(a). For the reasons set forth below, this Court's decision should be affirmed.

## FACTUAL AND PROCEDURAL HISTORY

On or about June 17, 2011, various jewelry, precious metals and other property were seized from the Real Property situated on 316 South Street, Philadelphia, Pennsylvania by Detective Frank Straup pursuant to a search and seizure warrant (No. 158532) and district complaint (No. 11-03-040869). These items were placed on the following property receipts:

1. Philadelphia Police Property Receipt #2975650;

2. Philadelphia Police Property Receipt #2975649;

3. Philadelphia Police Property Receipt #2975651.

The subject property remained in the possession of the Philadelphia Police, the District Attorney, and/or the City Solicitor until approximately May 1, 2013, and these items are the subject of the above-captioned matter. The Commonwealth did not seek to retain or forfeit the property in this case nor did they pursue a criminal case against Petitioner(s) Safa and/or Exotic Diamond Jewelers of Philadelphia, LLC, whose store is located at the above address.

On February 15, 2012, United Express Jewelry filed a Motion for Return of Property, alleging that it was the true and real owner of the subject items confiscated on or about June 17, 2011. On May 29, 2012, Yellow Gold filed a Motion for Return of Property, alleging that it was the true and real owner of the subject items confiscated on or about June 17, 2011. On May 29,

---

court determines that such property is contraband, in which case the court may order the property forfeited.

PA. R. CRIM. P. 588. This rule was renumbered as Rule 588 on March 1, 2000; it was formerly PA. R. CRIM. 324. *See* PA. R. CRIM. P. 588, n. (2001) (detailing history of amendments to rule and that it was renumbered in 2000).

2

2012, Italy in Gold Star filed a Motion for Return of Property, alleging that it was the true and real owner of the subject items confiscated on or about June 17, 2011. On June 28, 2011, Mohammed Safa filed a Motion for Return of Property, alleging that he was the true and real owner of the subject items confiscated on or about June 17, 2011.

On April 24, 2013 and April 30, 2013, respectively, this Court held a Return of Property hearing/trial. At the culmination of the evidence presented, this Court determined that the subject property described above was neither contraband, derivative contraband, nor stolen property. It further determined that Mohammed Safa and/or Exotic Diamond Jewelers of Philadelphia, LLC (Petitioner Safa/Exotic) were the rightful owners of this property. On April 30, 2013, Mohammed Safa's Motion for Return of Property was granted in its entirety, without conditions, and as against the other parties, Yellow Gold, Italy in Gold Star, and United Express Jewelry. Pursuant to this Court's Order, the subject items were to be returned promptly, without unnecessary delay or conditions, and in their entirety to Petitioner, Mohammed Safa and/or Exotic Diamond Jewelers of Philadelphia, LLC.

Accordingly, the Petition of United Express captioned under CP-51-MD-0001440-2012 was denied; the Petition of Yellow Gold captioned under CP-51-MD-0005324-2012 was denied; and the Petition of Italy in Gold Star captioned under CP-51-MD-0005325-2012 was denied.

On May 30, 2013, Appellant, United Express Jewelry, appealed to the Superior Court from this Court's Order entered in this matter on April 30, 2013, denying its Motion for Return of Property brought pursuant to PA. R. CRIM. P. 588. This Court ordered Appellant to file a Concise Statement of Errors Complained of on Appeal ("Statement") pursuant to PA. R.A.P. 1925(b). On June 27, 2013, Appellant filed a timely Statement.

## FINDINGS OF FACT

After a full and fair evidentiary hearing/trial was held on April 24, 2013 and April 30, 2013, this Court found that the subject property described above was neither contraband, derivative contraband, nor stolen property. It further found that this property should be returned, without delay, to Petitioner Safa/Exotic.

Based upon the evidence presented, admissible testimony, and credibility determinations, along with the record kept in this matter, this Court makes the following findings of fact:

1. Imad Safa and his brother Mohammed Safa are the co-owners of a company which operates under the banner name "Exotic Diamond Jewelers." (Notes of Testimony, Volume 1, April 24, 2013, pp. 16, 122). The Safa brothers recently built a store and set up a corporation on or about December of 2010. *Id.* at 16. The Safa brothers buy and sell jewelry, watches and other related merchandise at that store. *Id.* The store is located at 316 South Street, Philadelphia, Pennsylvania; it became fully operational on or about March of 2011. *Id.* at 17. To date, the store remains in operation. *Id.*

2. Mr. Safa explained, at the hearing, that he had working relationships with various wholesalers around country. *Id.* Wholesalers come into his store, give him goods on credit, and he then pays those wholesalers on a weekly basis. *Id.* Irrespective of whether specific jewelry goods are sold or not on any given week, these wholesalers expect to receive some form of payment for goods provided on credit every week. *Id.* Mr. Safa buys jewelry products/goods from various companies located in Miami, New York, California, etc. *Id.*

4

3. These jewelry goods can be purchased on credit or with cash---Mr. Safa also testified that there are frequently good buys or deals available for companies like his on the internet. *Id.* Whenever one pays in cash for such items, he or she can often get better prices. *Id.*

4. When Mr. Safa started the company located on South Street, he specifically bought items from Jabber Jewelry, Lee Jewelry, Nathanial Jewelry, City Jewelers, and various pawn shops. *Id.* That is how he began to build up and amass his store's inventory. *Id.* Those companies, other than the aforementioned pawn shops, are all wholesalers of jewelry products and related items. *Id.*

5. The other parties to this matter, to wit, Italy in Gold Star, Yellow Gold, and United Express are also all wholesalers, whose operations/facilities are located in the greater New York City area. *Id.* at 18.

6. Mr. Safa credibly testified that he had never sold or purchased any inventory to or from any of the above-mentioned wholesalers located in New York. *Id.*

7. Some of the jewelry items at issue in this case are labeled or stamped by these New York wholesalers. *Id.* A stamp is an indent or marking that assists jewelers in indentifying specific items or goods. *Id.* All jewelry items have stamps of some kind or type. *Id.* at 18-19. Essentially, where an item bears a company's stamp, this means or signifies that that company made or imported the item. *Id.* at 19.

8. However, that an item has a particular company's stamp does not in any way mean that that originating or importing company retains any title to or interest in the item. *Id.* at 19. Jewelers may purchase those very same items which bear a specific company's stamp from numerous locations or other companies. *Id.* In fact, almost identical looking items may very well have stamps from different companies. *Id.*

9. Although Mr. Safa had never personally bought or purchased any items from any of the other wholesalers involved in this matter, he has frequently seen and come across items which have their (the various New York wholesalers who are parties to this matter) stamps or labels. *Id.* He has purchased such items bearing those stamps on many occasions. *Id.* Moreover, he has a number of customers who apparently often trade in items that have their stamps or insignia. *Id.* at 19-20.

10. Mr. Safa's father, Jamal Safa, also owned and operated a jewelry store company. *Id.* at 20. It was called New Diamond City, and was located in the Bronx Borough of the City of New York. *Id.* Mr. Safa did not have any business interest at any time in his father's company, but he would help his father out during holiday seasons on occasion (notably on Valentine's Day and Christmas). *Id.* at 20.

11. Jamal Safa's store is no longer operational in New York. *Id.* When Imad Safa and his brother opened their own store on South Street, they had absolutely no business ties to or relationship with the company owned and operated by their father, Jamal, in New York. *Id.* at 21. Again, Mr. Safa would assist his father from time to time during peak holiday seasons with selling jewelry items. *Id.*

12. Mr. Safa never negotiated contracts with wholesalers or otherwise worked on his father's behalf at that time, however. *Id.* at 21. He merely assisted with selling items to customers who would frequent his father's store around busy holidays. *Id.*

13. In that capacity of helping out his father, Imad Safa never had any personal dealings with any of the wholesalers involved in this matter who operate their companies out of New York. *Id.* at 21-22.

14. When Mr. Safa opened his store location in Philadelphia, he did not acquire any of his jewelry inventory from either his father or from his father's former company, New Diamond City. *Id.* at 22. Further, Jamal Safa never gave any jewelry to Mr. Safa. *Id.*

15. Mr. Safa credibly testified that jewelers typically do not maintain the most scrupulous of records of their inventoried items. *Id.* at 25. Specific jewelry pieces are often identified by generic manufacturing numbers and by generic type (e.g., diamond ring or assorted gold jewelry) or by carat weight. *Id.* His business invoices, records, and receipts typically do not display or show specific identifying serial numbers for specific items. *Id.*

16. Moreover, only specialized items like Cartier items or Chanel items come with specific or special manufacturing numbers or identifiers/serial numbers and certificates. Those sorts of items are thus much easier to keep track of and catalogue than less expensive and mass produced jewelry pieces. *Id.* at 26.

17. Mr. Safa credibly testified that he did not create his own list of specific numbers for any mass produced items located in his store either. *Id.*

18. On or about June 17, 2011, at around 7:00 a.m., Mr. Safa opened up his store in Philadelphia. *Id.* At that time, Detective Frank Straup came into the store alone. *Id.* at 26. Prior to meeting Detective Straup that day, a representative of Italy in Gold Star had apparently called Mr. Safa about a month before. *Id.* at 27, 29. That individual, Aslam Nuwabi, stated that Mr. Safa would have to pay him "his father's money" or else he would file criminal charges against Mr. Safa. *Id.* at 27.

19. Mr. Safa made it perfectly clear that he did not owe this company any debt or money or property. *Id.* at 27.

20. At that time, Mr. Safa had no working business relationship with his father, Jamal, or his father's company, New Diamond City. *Id.* at 28. His store did not have any such relationship with his father's company or his father, either. *Id.*

21. Detective Frank Straup initially knocked on the door on the date at issue. *Id.* He came in by himself when Mr. Safa buzzed him in. *Id.* The detective then threatened Mr. Safa, and said that he could do things the easy way or the hard way. *Id.*

22. The detective informed Mr. Safa that a number of individuals were waiting outside and that they wished to be paid. *Id.* The detective then told Mr. Safa that he would make this a very simple and easy situation for him---he offered to have Mr. Safa pay half of some unknown/undisclosed sum or debt and if he did that, he would be forgiven for the rest of this unknown sum or debt. *Id.*

23. Mr. Safa did not agree to this "bargain" deal or "offer." *Id.* He stated that he did not owe any debt to these individuals and therefore refused to make any such payments. *Id.* The detective, pursuant to a search and seizure warrant, then came back into the store with about 8 other individuals. *Id.* at 28-29.

24. It is not in dispute that the events which followed were chaotic and messy. Individuals apparently began grabbing various items located in the store. *Id.* at 29. Various goods, particularly gold items, were weighed on a scale and that property was apparently seized by weight. *Id.* at 29.

25. Mr. Safa has scales in his store which can weigh up to 2000 grams. *Id.* In the presence of Mr. Safa, the individuals placed bags on the scale and weighed them. *Id.*

8

26. The police department would not allow Mr. Safa to stand up during this chaotic event. *Id.* at 29. As these representatives of the wholesalers were seizing the subject property, they did not check items off from a list or compare items to invoices or receipts. *Id.* at 30.

27. Mr. Safa credibly testified at the hearing that these folks arrived with a plain white piece of paper. *Id.* It apparently said "5.8 kilos" and little else. *Id.* No one provided any receipts to the detective in the presence of Mr. Safa. *Id.* Detective Straup himself acknowledged as much during his testimony at this hearing. *See id.* at 114-116.

Detective Straup testified as follows:

THE COURT: But his [Attorney Cevallos's] question was at the same time that they were saying to you this was their jewelry, at that time when they said this piece is mine, did they produce a document at that time saying this was mine?

THE WITNESS: No.

THE COURT: How long thereafter did they produce any document, if at all, saying that?

THE WITNESS: Within two or three days, you know, before I put this stuff into evidence.

*Id.* at 115-116.

28. Mr. Safa subsequently offered to show the detective invoices and documentation which would verify that he was the rightful owner of the items which were taken from his store. *Id.* at 31. Mr. Safa was told that it was too late now and that he would be arrested. *Id.*

29. This took place approximately one month after the search and seizure of the subject property. *Id.*

30. The City of Philadelphia attempted to prosecute Mr. Safa for receipt/possession of these allegedly stolen goods. *Id.* However, the charges were dropped against Mr. Safa. *Id.* In

fact, the Return of Property Hearing marked the first occasion on which Mr. Safa had apparently been afforded the opportunity to speak to a Judge in open court about these events. *Id.*

31. Mr. Safa provided this Court with invoices and records. *Id.* No specific items (other than assorted jewelry or bunches of jewelry) could be identified by these documents for the reasons already noted in the above. Those purchase invoices and receipts were kept in the ordinary course of Exotic's business. *Id.* at 31. They are ordinarily filed and stored by the Safas, and they reflect purchases made by their company. *Id.* at 24, 31. The purchases listed on these documents were purportedly made for the purpose of building up their store inventory as the brothers were in the process of creating/establishing their store in Philadelphia. *Id.* at 24. Mr. Safa credibly testified to the authenticity of these business records and that these documents were not created or drawn up in anticipation of any litigation. *Id.* at 24.

32. Although these invoices do not list specific matching serial numbers for specific items, Mr. Safa credibly testified that these invoice receipts concerned the subject items at issue in this case. *Id.* at 25. They identify those items as assorted gold jewelry and as bunches of jewelry---as such, these descriptions refer to a variety of items which are assorted and include different types of jewelry like rosaries, pendants, rings, and so forth. *Id.* at 32. Those assorted items were weighed by Mr. Safa, and they are referenced in these invoices by their carat weight and through generic descriptions (e.g., 987 grams, 14 carat assorted gold jewelry). *Id.* at 32.

33. These invoice receipts reflect and/or involve all the subject jewelry in dispute in this matter. *Id.* at 25. Approximately 5.8 kilograms of assorted gold items were taken from Mr. Safa's store and placed on property receipts by Detective Straup. *Id.*

34. Mr. Safa purchased various items which have the stamp of Yellow Gold and Italy. *Id.* at 39. These items are mass-produced jewelry. *Id.* Model numbers are generic in the jewelry

industry, with the exception of novelty or specialty items like Cartier pieces that come with specific serial numbers and certificates. *Id.* Numerous items can have the same model numbers; they can also bear the same insignia stamps as well. *Id.* at 42.

35. As Mr. Safa's invoices do not reference specific items by specific serial numbers (no such numbers apparently exist for mass produced jewelry at the moment), his records simply reference the weight of his inventory items and utilize generic/general descriptions. *Id.* at 44.

36. He credibly testified that he has a good general sense of what bulk produced items he has at any given time in his store in inventory, however. *Id.*

37. The subject jewelry taken from Mr. Safa's store was marked with various tags. *Id.* at 48-49. These tags reflect the specific values or suggested retail prices of particular items, how many carats an item weighs, and also the generic general model numbers for such items. *Id.* at 48-49. General tags, which identify the mass-produced model number and/or its suggested retail value, do not in any way demonstrate ownership or indicate who owns a particular piece of jewelry. *Id.* at 62.

38. This Court finds that the other parties involved in this matter failed to produce any receipts or invoices demonstrating that they had title to the subject goods.

39. This Court finds that none of the other parties were able to demonstrate that they had superior title to these items or that they themselves had purchased these items.

40. It is not in dispute that all items at issue in this hearing were taken from Mr. Safa's store. *Id.* at 59. Mr. Safa saw each of these items taken from his store by Detective Straup on the date in question. *Id.* All of these items bore his tags. *Id.* Some of these tags were apparently taken off by Detective Straup and/or the other parties to this action when they were seized on June 17th, 2013. *Id.*

11

41.     Mr. Safa identified all of the items generically marked and listed on property receipts as belonging to his company, Exotic Diamond Jewelers. *Id.* at 66. Mr. Safa did not produce that list. Nevertheless, he did recognize the items listed on that list as belonging to his store. *Id.* at 65-66.

42.     None of the documents presented to this Court by any of the other parties to this action bore Mr. Safa's signature. None of those documents demonstrated any working relationship amongst or between any of these parties and Mr. Safa or his place of business. None of those documents established that any of these other parties had superior title, or even any title, to these goods.

43.     On the date that these items were seized and placed on property receipts, Detective Straup was not provided with any documentation or receipts or proof of ownership by any of the individuals (the other parties/petitioners) who claimed that they owned the subject property. *Id.* at 84.

44.     Those individuals had the opportunity to inspect these goods and look for markings and identifiers or serial numbers and the like. *See id.* They were present with the Detective as he placed various jewelry items in property receipts on June 17th, 2011. *Id.* at 85. The detective conveniently received "memoranda" documents several days later from United Express Jewelry. *Id.*

45.     Detective Straup admitted that he actually wrote on blank invoices of United Express Jewelry—documents which had already been signed by an unknown third party and which had been provided to him by United Express Jewelry in an effort to demonstrate its ownership of the subject property days after the items had been confiscated. *Id.* at 91, 94.

12

46. This Court was deeply troubled by the chaotic and sloppy way in which this investigation was handled by Detective Straup. People were apparently, in the words of Detective Straup, just "grabbing stuff" and claiming that they owned various items located in Mr. Safa's store; they did so without providing the detective with any corroborating documentation or evidence of such ownership. *Id.* at 111, 114, 116. Again, no receipts or documented proof of ownership of the subject goods was provided to the detective at the time of the execution of the search and seizure warrant. *Id.* Only days later were any such alleged documents provided to this detective. Again, the detective subsequently altered or modified all of these documents. *Id.* at 94, 95, 114, 116.

47. At the hearing, Detective Straup did not indicate that he had any familiarity with any of these parties' record keeping processes. *See id.* at 117-120. He readily acknowledged that he did not have any familiarity with various terms of art utilized in the jewelry industry, or with whether generic identifying serial numbers were commonplace in the industry for mass produced jewelry, or with whether stamps are akin to brand names in the jewelry industry and did not constitute proof of ownership. *Id.* at 117-120.

48. Mr. Safa explained to this Court that he has suffered significant financial losses as a result of this property being seized by the Commonwealth. *Id.* at 67. He pointed out that the value of goods in the jewelry industry can be likened to goods in the fashion industry. *Id.* Different styles of products sell better when they are "in style." *Id.* Many of these items are no longer "in style" and will prove difficult to sell moving forward. *Id.*

49. Mr. Safa indicated that he has lost customers and sales as a result of these items being seized. *Id.* at 66-67. Mr. Safa relayed the following information to this Court concerning one such customer he lost as result of these items being seized:

13

THE WITNESS: I lost the customer. The sale I was making a profit on it. If it cost me $7,000, I was going to sell it for $12,000. That alone is a $5,000 loss. I had to refund [the customer] the money for it, but I still tried to win over the customer. . . . It's embarrassing for you to explain to somebody the Philadelphia Police Department cam trying to collect a debt.

*Id.* at 67.

50.     This Court did not find Detective Straup credible at all. His investigation was baseless and extremely prejudicial and suspect in the circumstances. (Notes of Testimony, Volume 1, April 30, 2013, p. 171).

51.     This Court did not find Mr. Gabriel from United Express Jewelry to be credible, nor any of the representatives of Yellow Gold or Gold Star. *Id.*

52.     In contrast, this Court did find Mr. Safa's testimony credible. *Id.* at 172.

53.     At the culmination of the evidence presented at the Return of Property Hearing, this Court found that only Mr. Safa had presented credible and competent evidence that this jewelry actually belonged to him and/or his company. *Id.* at 172.

54.     Accordingly, at the conclusion of the April 30th, 2013 hearing/trial, this Court ruled that the property should be returned to the Petitioner Exotic Jewelry/Safa without delay. *Id.* at 172.

## ISSUES

In its 1925(b) Statement of Matters Complained of on Appeal, United Express Jewelry, as appellant, raises the following issues:

1.     The trial court committed error by ruling that Max Weiner, proposed witness of United Express Jewelry, was not qualified as an expert in the field of jewelry design, manufacture, and wholesale distribution.

2.     In that it was offered that Max Weiner would have testified to the contrary of Mohammed Safa and consistent with United Express Jewelry principal Gabriel Nisanov, that the jewelry identifying numbers on the transaction contemporaneous United Express Jewelry marketing records (memoranda,

14

invoices, etc.) referred to specific manufacturer model/design/style numbers and not industry generic style numbers, the exclusion of the said proposed expert witness and testimony was material, and was reversible error.

3.  With respect to every United Express Jewelry and/or City of Philadelphia Police Department document which the Trial Court refused to admit as business record evidence, reversible error was committed.

This statement introduces alleged facts that are not part of the trial record and is therefore misleading. At the Return of Property trial/hearing, this Court did not find Appellant's (Gabriel Nisanov) testimony to be credible. In addition, this Court, as finder of fact, did not determine based on credibility that the jewelry indentifying numbers noted in the above referred to specific manufacturer model/design/style numbers. Virtually no credibility was given to the evidence presented by United Express Jewelry in connection with this matter. This Court also did not find Detective Straup's testimony to be credible; his investigation was extremely prejudicial, baseless, and irregular, to say the very least. However, this Court did find that the testimony of Mr. Safa was credible.

With that said, this Court will address the substantive legal issues raised in the above Statement.

## STANDARD OF REVIEW

An appellate court's review of a trial court's decision on petition for return of property is limited to ascertaining whether findings of fact made by the trial court are supported by competent evidence and examining whether the trial court abused its discretion or committed error of law. *Commonwealth v. Pena*, 751 A.2d 709 (Pa.Cmwlth. 2000).

15

Absent a manifest abuse of its discretion, any and all evidentiary rulings lie within the sound discretion of the trial judge and will not be reversed. *See, e.g., Capan v. Divine Providence Hospital*, 270 Pa.Super. 127, 410 A.2d 1282 (Pa.Super. 1980).

Finally, it is within the providence of the finder of fact to pass upon the credibility of the witnesses and the weight to be accorded the evidence presented. *Commonwealth v. Alston, 461 572, 403 A.2d 536 (1979)*. "The trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Valette, 531 Pa. 384, 388 (Pa. 1992)*, citing *Commonwealth v. Griscavage, 512 Pa. 540, 543, 517 A.2d 1256, 1257 (1986)*.

## DISCUSSION

### I. APPELLANT'S CLAIM THAT THIS COURT ERRED BY RULING THAT MAX WEINER WAS NOT QUALIFIED TO TESTIFY AS AN EXPERT WITNESS IS WITHOUT MERIT.

Here, Appellant contends that this Court erred by ruling that its proposed witness, Max Weiner, was not qualified as an expert in the field of jewelry design, manufacture, and wholesale distribution. For the reasons set forth below, this claim is without merit.

It is well settled in this Commonwealth that the qualification of an expert witness lies within the sound discretion of the trial judge. *See, e.g., Miller v. Brass Rail Tavern, Inc.* 541 Pa. 474, 664 A.2d 525 (Pa. 1995). It is equally well settled that, absent an abuse of the discretion, the decision of the trial judge to refuse to permit a witness from testifying should be upheld. *Id.* at 528. The test to be applied when qualifying an expert witness is as follows: the trial judge must determine whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation beyond that of a layperson. *Id.* Where a witness demonstrably

16

possesses such specialized knowledge, she may opine at trial and the weight of such testimony is for the trier of fact to determine. *Id.* (citing *Commonwealth v. Gonzalez*, 519 Pa. 116, 128, 546 A.2d 26, 31 (1988)). Further, a witness may be qualified to render such an opinion through his or her experience and training. *Id.* (citing *Rutter v. Northeastern Beaver County School District*, 496 Pa. 560, 598, 437 A.2d 1198, 1202 (1981) (plurality opinion). A witness need not possess any formal schooling or education on the subject matter under investigation. *See id.* at 528. What is required, however, is that the expert possess more knowledge "than is otherwise within the ordinary range of training, knowledge, intelligence or experience" in a particular field or area. *Id.*

In this case, Appellant failed to provide this Court or opposing counsel with *any notice* that he intended to have an expert witness testify at the hearing. The proposed witness, Max Weiner, had never appeared or testified as an expert before in any matter. The proposed witness had never been qualified to testify as an expert before in any matter. Moreover, the proposed witness did not provide this Court (or opposing counsel) with a copy of his curriculum vitae detailing his credentials and experience in the jewelry industry. Consequently, this Court could not accurately assess his credentials and qualifications in the circumstances.

Further, Mr. Weiner confusingly testified that different vendors use different tagging or numbering systems to identify their goods.[2] However, even if this Court were inclined to believe

---

[2]    Mr. Weiner testified as follows in regards to his familiarity with the tagging protocols/procedures of various jewelry vendors: "I worked *for somebody* that had a tagging process, saw how they developed *their system* with respect to coming up with numbers. *I developed my own system* as to come up with numbers. I use numerical order, and *that's how we do it.* . . . . *Certain vendors* put their initials in front of their numbers . . . ." (Notes of testimony, Volume I, April 30, 2013, p. 83-84) (emphasis added).

Here, Mr. Weiner doubtless intimated that different vendors utilize different marking systems and follow different protocols for identifying their goods. Even if we take him at his word that this is true, he never once indicated that he had any familiarity with the specific vendors who allegedly tagged or marked the specific items at issue in this matter. It should also be noted that Mr. Weiner's vague testimony that

17

that this were the case, Appellant never established that Mr. Weiner had any familiarity with the specific jewelry tags at issue in this case. Mr. Weiner vaguely asserted that he had some familiarity with the various practices of other manufacturers/wholesalers and their respective tagging systems. Nevertheless, his confusing and vague testimony did not establish that he had any specialized knowledge about the items at issue in this case or with how these specific items were allegedly marked or tagged by their respective manufacturers/distributors/vendors.

This claim must also fail for a separate and unrelated reason. According to Appellant, Mr. Weiner would have apparently testified that the jewelry identifying numbers listed on various United Express Jewelry marketing records referred to specific design/model/style numbers and not to industry generic style numbers. This Court already heard testimony to this effect from United Express Jewelry principle Gabriel Nisanov, and thus such testimony would have been merely duplicative or cumulative in effect. Appellant does not appear to deny that this testimony would have been cumulative or duplicative; he acknowledges in his own 1925(b) statement that such testimony would have been "consistent with United Express Jewelry principle Gabriel Nisanov." Pennsylvania Rule of Evidence 403 specifically directs a trial court to exclude the presentation of duplicative or cumulative evidence in such circumstances. It provides in relevant part: "Although relevant, evidence may be excluded if its probative value is outweighed by . . . needless presentation of cumulative evidence." PA.R.E. 403 (2013). As this evidence would have been merely repetitious of evidence already introduced by Appellant, this Court also did not err in excluding this "expert" from testifying on this ground. *See, e.g., Boyd v. Hertz Corp.*, 281 A.2d 679, 684 (Pa.Super. 1971) (holding that trial court has discretion to

---

he "worked for somebody" who "had a tagging process" did not exactly leave this Court with a clear impression of where/how he received his training and experience in this domain.

18

impose limits on a party's attempts to introduce further evidence which is repetitious and duplicative of evidence it has already introduced).

For all these reasons, this Court did not err in ruling that Mr. Weiner was not qualified to testify as an expert in this matter.

## II. APPELLANT'S CLAIM THAT THIS COURT ERRED BY REFUSING TO ADMIT AS BUSINESS RECORD EVIDENCE ALL UNITED EXPRESS JEWELRY AND/OR CITY OF PHILADELPHIA POLICE DEPARTMENT DOCUMENTS IS WITHOUT MERIT AND IS WAIVED DUE TO VAGUENESS.

Pa.R.A.P. 1925(b)(4)(ii) provides that an appellant's statement of matters complained of on appeal must "concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." Pa.R.A.P. 1925(b)(4)(vii) provides that any issues not raised in accordance with subsection (b) of this rule are deemed waived.

Our courts have repeatedly held that any issues which are not raised in a *Rule 1925(b)* statement will be deemed waived for review. *See, e.g., Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306 (Pa. 1998). Further, an Appellant is required to identify in his or her concise statement the error(s) which he or she wishes to be addressed by the court with specificity. *See, e.g., Commonwealth v. Butler*, 2000 PA Super 187, 756 A.2d 55 (Pa. Super. 2000); *see also, Commonwealth v. Dowling*, 2001 PA Super 166, 778 A.2d 683 (Pa. Super. 2001). As the Superior Court has further elaborated: The statement must be "*specific enough* for the trial court to identify and address the issue [an appellant] wishes to raise on appeal." *Commonwealth v. Reeves*, 2006 PA Super 196, 907 A.2d 1, 2 (Pa. Super. 2006) (emphasis added). Simply put, "[a] [c]oncise [s]tatement which is *too vague* to allow the court to identify the issues raised on appeal is the functional equivalent of no [c]oncise [s]tatement at all." *Id* (emphasis added). When a

19

court has to guess at the issues raised on appeal because the appellant's concise statement is overly vague or broad, the court may find waiver. *Id.*

In the instant case, Appellant complains that this Court erred by failing to admit into the record <u>all</u> United Express Jewelry business documents. Appellant, however, fails to make any reference to what specific documents this Court refused to admit into the record or, for that matter, why such evidence would be relevant and of any probative value. Appellant does not develop this contention in any more detail and therefore has waived this issue. Here, too, it should be noted that there are over 300 pages of Notes of Testimony pertaining to this matter, and this Court cannot reasonably guess or speculate as to which specific documents Appellant is referencing in his poorly crafted and vague 1925(b) statement. Moreover, this Court is perplexed by this allegation for another reason: All of Appellant's business records and exhibits were admitted into evidence. It should be noted that this Court, in exercising its discretion as finder of fact, did not give very much credence or weight to those documents. However, all of Appellant's business records were admitted into evidence.

## CONCLUSION

For all the foregoing reasons, this Court's decision should be affirmed.

BY THE COURT:

PAULA PATRICK, J.

20