J-A25022-19; J-A25023-19

2021 PA Super 93

GEORGE ROGERS, ADMINISTRATOR OF
THE ESTATE OF JOSHUA ROGERS

    Appellant

    v.

LLOYD THOMAS, HAYDEN THOMAS
AND/OR THE OUTDOORSMAN INC.

IN THE SUPERIOR COURT
OF PENNSYLVANIA

No. 1915 MDA 2018

Appeal from the Order Dated November 21, 2018
In the Court of Common Pleas of Susquehanna County
Civil Division at No: 2016-1244

SUZETTE BENET, ADMINISTRATOR OF
THE ESTATE OF GILBERTO ALVAREZ

    Appellant

    v.

LLOYD THOMAS, HAYDEN THOMAS
AND/OR THE OUTDOORSMAN INC.

IN THE SUPERIOR COURT
OF PENNSYLVANIA

No. 1916 MDA 2018

Appeal from the Order Entered November 21, 2018
In the Court of Common Pleas of Susquehanna County
Civil Division at No: 2016-00869

BEFORE:  STABILE, J., McLAUGHLIN, J., and MUSMANNO, J.

CONCURRING AND DISSENTING OPINION BY STABILE, J.:

**FILED: MAY 11, 2021**

I concur in the following conclusions reached by the Majority: it was error for the trial court to permit the jury to determine whether Lloyd was negligent; Lloyd's negligence did not establish as a matter of law that Hayden and the Outdoorsman were negligent; it was proper to instruct the jury on comparative negligence; the grant of a nonsuit as to Hayden was proper; admitting evidence of chronic drug use was not an abuse of discretion; and Appellants waived any claim before this Court regarding jury instructions. I further concur in the Majority's determinations that the trial court did not err when it denied Appellants' motion for a directed verdict as to Hayden and the Outdoorsman, and that it was not an abuse of discretion to coordinate and consolidate these actions for trial. I do, however, disagree with the Majority's conclusions to grant a new trial as to Lloyd and the Outdoorsman, not to address the propriety of quashing the subpoena for Dr. Shovlin, and not to address whether it was error to admit evidence of prior bad acts. I address each area of disagreement seriatim.

To place the issues in context, I provide a brief summary of the facts gleaned from various trial court opinions, the parties' briefs[1], and the record in these cases.

_____

[1] Our rules are very clear as to what must be contained in the "Statement of the Case" in an appellant's brief. **See** Pa.R.A.P. 2117. In particular, the rules require, *inter alia*, a closely condensed chronological statement in narrative form necessary to determine the points in controversy. **Id.** Of particular relevance here, Rule 2117 also requires that the statement not contain any argument and that it is the responsibility of appellant to present a statement

J-A25022-19

These actions arise out of a February 11, 2012 shooting incident when Lloyd Thomas (Lloyd) shot and killed Joshua Rogers (Rogers) and Gilberto Alvarez (Alvarez) on property owned by his father, Hayden Thomas (Hayden). Lloyd subsequently was criminally charged and convicted of the voluntary manslaughter of Rogers and Alvarez.

Hayden was the owner and sole occupant of a home located at 114 Pine Ayers Road, Hallstead, Pennsylvania. Hayden was 79 years old at the time of Lloyd's trial and had resided in the home for 50 years. The home was located in a somewhat remote location accessible by crossing a narrow wooden bridge and then driving up a winding gravel road. Hayden operated a small gun shop called The Outdoorsman (Outdoorsman) from a room attached to his home. On the date in question, Hayden was not home and asked his son Lloyd to watch his dog. Lloyd went to his father's home the day before this incident and installed a new birdfeeder. The following morning, he noticed squirrels had damaged the birdfeeder. He took his pistol and began shooting at squirrels. At about this time, Rogers was driving a Mustang along a road near Hayden's home with Alvarez as his passenger. They returned to their home

_____

in a balanced presentation of the history of the proceedings and the respective contentions of the parties. Pa.R.A.P. 2117(b). Appellants' brief fails in almost all material regards to comply with these requirements. Specifically, Appellants' statement is not stated in a chronological fashion, completely omits a separately stated procedural history, presents 27 pages of a statement replete with argument, and then only very little in terms of facts late in this statement to provide the reader any coherent description of this shooting incident. Regrettably, it has taken this jurist countless hours to scour the record and briefs in this case to attempt to provide a succinct background of record facts against which the issues in this case may be decided.

- 3 -

complaining someone had shot their car. They were aggravated, upset, and stated that they were going to find the person who shot at the car and make them pay for damages. They did not call the police.

Upon returning to their homes, both Rogers and Alvarez retrieved camouflaged coats and secured firearms. At the time, Rogers was prohibited from owning or having access to firearms. At Lloyd's criminal trial, a witness testified that on the day of the shooting incident he saw a black Mustang turn onto Pine Ayers Road, cross the bridge, and turn and park on the road. Two men exited and he thought they were going to Hayden's home, but instead of going up the road, they proceeded through the woods. The route through the woods was up a steep bank. The vehicle was parked at the end of the drive to effectively block anyone from driving up the road to Hayden's home. Another witness testified that on the day of this incident a man knocked on her door and asked if she knew whether anyone was shooting. She responded there was a gun shop on the hill and they might be practicing or sighting guns. The witness stated that the person at the door said someone shot at his vehicle, he was looking to see who it was, and it appeared he was trying to track down the shooter.

Lloyd testified that on the morning of February 11, 2012, he was at his father's property to watch his father's dog. Lloyd said he was in the garage when he heard the dogs bark. He observed two men split up and surround the house. He did not view this as normal. He went into the house and saw Rogers under the deck. Rogers shoved a shotgun in Lloyd's face and Lloyd

was scared for his life. He then shot Rogers two times. Lloyd then encountered Alvarez on the other side of the home. Lloyd saw him leaving the garage and thought he was in the garage trying to get into the gun shop. When Alvarez came out of the gun shop, he walked past Lloyd, whereupon Lloyd yelled to him, but Alvarez was walking quickly and showed no fear. Lloyd testified he shot Alvarez because he had a shotgun shoved in his face 30 seconds before, he was scared for his life, and believed he still was under a threat from his encounter with Rogers.

The Rogers Estate and the Alvarez Estate filed similar wrongful death and survival claims on March 5, 2012 and February 10, 2014, respectively, against Lloyd, Hayden, and the Outdoorsman. Following a nine-day jury trial that commenced on April 16, 2018 and ended on April 26, 2018, a jury returned a verdict in favor of Lloyd and the Outdoorsman. Previously, on April 24, 2018, the trial court granted a compulsory nonsuit as to Hayden. Appellants timely filed post-trial motions that the trial court denied. These appeals followed.

## A. The Grant of a New Trial as to Lloyd and the Outdoorsman.[2]

        (i)      New trial as to Lloyd

---

[2] "In reviewing an order to grant a new trial, our standard of review is limited to determining whether the trial court abused its discretion or committed an error of law." *Lykes v. Yates*, 77 A.3d 27, 30 (Pa. Super. 2013) (citations and alterations omitted).

I agree with the Majority that it was error for the trial court to permit the jury to determine whether Lloyd was negligent, since his conviction for voluntary manslaughter conclusively established that he acted negligently. Nonetheless, I would conclude this was harmless error based on the verdicts returned by the jury in these cases.

The verdict slips returned by the jury in the Rogers and Alvarez Estate cases consisted of 11 and 9 questions, respectively. The jury in both cases completed only the first five questions on each verdict slip, since their answers to Question 5 did not require consideration of the remaining questions. Reproduced below are the first five questions and answers that were identical on each verdict slip.[3]

**Question 1:**

Do you find that any of the following Defendant Parties[4] was negligent?

Lloyd Thomas      _____ Yes      ____x____ No

The Outdoorsman      _____ Yes      ____x____ No

**Question 2:**

Was the negligence of any of the Defendants you have found to be negligent in **Question 1** a factual cause of any harm

---

[3] Although separate verdict slips were submitted for each of the decedents' estates, the decedent names have been combined in this reproduction to avoid reproducing the verdict slip a second time, as the jury responses were identical for each estate.

[4] Hayden Thomas was not included on the verdict slip, since the trial court granted Hayden's motion for nonsuit at the close of Appellants' case.

to [Joshua Rogers] [Gilberto Alvarez]? Only answer for those defendants you have negligent [*sic*] in response to **Question 1**.

Lloyd Thomas      _____ Yes      _____ No

The Outdoorsman    _____ Yes      _____ No

**Question 3:**

Do you find that [Joshua Rogers] [Gilberto Alvarez] was negligent?

_____x_____ Yes          _____ No

**Question 4:**

If you answered **QUESTION 3** "Yes," was the negligence of [Joshua Rogers] [Gilberto Alvarez] a factual cause of any harm to him?

_____x_____ Yes          _____ No

**Question 5:**

Taking the combined negligence that was a factual cause in bringing about the harm to [Joshua Rogers] [Gilberto Alvarez] as 100%, what percentage of that causal negligence was attributable to the following Parties that you have found to be causally negligent?

> Percentage of causal negligence attributable to Lloyd Thomas (answer only if you answered "Yes" to Questions 1 and 2 for Lloyd Thomas).

> _____0_____ %

> Percentage of causal negligence attributable to the Outdoorsman, Inc. (answer only if you answered "Yes" to Questions 1 and 2 for the Outdoorsman).

> _____0_____ %

> Percentage of causal negligence attributable to Joshua Rogers (answer only if you answered "Yes" to Questions 3 and 4 for [Joshua Rogers] [Gilberto Alvarez]).
>
> <u>    100    </u> %
>
> TOTAL:    100%
>
> If you have found [Joshua Rogers] [Gilberto Alvarez] percentage is greater than 50%, [Joshua Rogers] [Gilberto Alvarez] cannot recover and you should not answer any other questions. Please tell the Court Officer you have reached a verdict.

As can be seen, the jury concluded that both Lloyd and the Outdoorsman were not negligent. While the jury was entitled to determine whether the Outdoorsman was negligent, the jury should have been directed, as a matter of law, that Lloyd was negligent. Regardless, after finding that neither defendant was negligent, the jury then was asked to consider whether the negligence of any defendant was a factual cause of any harm to the decedents. This question was left unanswered consistent with the instruction to Question 2 that instructed the jury only to answer that question if it found any defendant negligent in Question 1. This construct of the verdict slip was at variance with our law that makes it unnecessary to consider factual cause if no party is found to have acted negligently in the first instance. ***See Boyle v. Independent Lift Truck, Inc.***, 6 A.3d 492, 496 (Pa. 2010) (where a jury, through a special verdict sheet, finds no negligence on the part of a defendant, any issue of comparative negligence no longer remains in the case, and any purported error regarding a question on comparative negligence is non-

prejudicial, and does not serve as a basis for a new trial). The verdict slip also was at variance with standard suggested jury instructions that provide that if the answer to Question 1 is "No" as to all defendants, the plaintiff cannot recover, the jury should not answer any further questions, and the jury should inform the court it has reached a verdict. *See* Pennsylvania Standard Civil Jury Instruction 13.300 (Fourth Edition). The omission of this instruction however, allowed the jury in these cases to proceed and consider whether the decedents were negligent, whether their negligence was a factual cause of their harm, and if so, then to weigh comparatively the negligence of all parties. These were determinations the jury would have had to make if properly instructed that Lloyd had to be found negligent. As the completed verdict slips reveal, the jury found that both decedents were negligent, their negligence was a factual cause of their harm, and each decedent was 100% causally negligent for his own harm. Had the trial court properly instructed the jury it had to find Lloyd negligent, the jury could not have assigned 100% of the negligence to each of the decedents. Some percentage of negligence would have had to be assigned to Lloyd, even if nominal. The Majority correctly points out, however, that this would not end the inquiry, since Appellants still had to prove causation.

Pennsylvania law provides that if a plaintiff's negligence is greater than the causal negligence of the defendant or defendants, *i.e.*, greater than 50%, against whom recovery is sought, a plaintiff may not recover damages. *See*

42 Pa.C.S.A. §7102 (the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought). Even though the jury's verdicts did not assign any negligence to Lloyd, the verdicts nonetheless evidenced an overwhelming and unambiguous judgment that each decedent was far more than 50% responsible for his own harm; in fact, the jury found each decedent to be 100% *casually* responsible for his own harm. Under these circumstances, it reasonably cannot be disputed that if the jury had to assign some percentage of negligence to Lloyd, its determination that each of the decedents was more than 50% *causally* negligent would remain unaffected, thereby precluding any recovery. Moreover, even if the jury was instructed properly to find Lloyd negligent, the jury nonetheless found, by not providing an answer to Question 2, that none of the defendants, including Lloyd, was a factual cause of any harm to either decedent. The jury's determination that no defendant was a factual cause of harm to the decedents, and that each decedent's *causal* negligence was fully responsible for his own harm, precluded any recovery on these bases alone. The jury's response to Questions 3 and 4 supported this determination further, since the jury found each of the decedents' negligence to be a factual cause of his own harm. Had the verdict slip instructed the jury to return after completing Question 1 finding no defendant negligent, I would not reach the

same result finding harmless error. However, the jury's determination here was overwhelmingly clear and unambiguous. It did not find any conduct by the defendants to have been a factual cause of harm and, instead, found that each of the decedents was entirely causally negligent for causing his own harm.

It well is established that in order for a party to be awarded a new trial, the moving party must demonstrate that it was prejudiced by the alleged error of the trial court. *Boyle*, 6 A.3d at 494. In other words, to grant a new trial, we must conclude the trial court committed an error of law or an abuse of discretion that may have affected the verdict. *Id.* Here, even if the trial court correctly directed the jury that it had to find Lloyd negligent, Appellants still would not have recovered given the jury's overwhelming sentiment, as expressed on the verdict slips, that the decedents were wholly at fault for causing their harm. Under these circumstances, I would conclude the trial court's failure to direct the jury that Lloyd was negligent constitutes harmless error and that Appellants suffered no prejudice, since on the question of causation the jury found beyond cavil the decedents to be entirely responsible for their harm. *See Boyle*, 6 A.3d at 698 (grant of new trial reversed because error on verdict slip did not result in prejudice); *Goertel v. Muth*, 480 A.2d 303, 306 (Pa. Super. 1984) (no new trial for ambiguous or improper verdict that can be corrected without resort to new trial when jury's intention is free of ambiguity and clearly understood).

Although not addressed by the Majority, I also would reject Appellants' argument that it was error for the trial court to charge on comparative negligence on the basis that Lloyd's conviction for voluntary manslaughter rendered his conduct "reckless" and therefore, it could not be compared with negligence. Appellants' Brief at 51-56. From what I can discern, Appellants have not provided this Court any record material from Lloyd's criminal case.[5] What is of record is an October 1, 2014 opinion and order of the Lackawanna County Common Pleas Court granting Appellants' motion for partial summary judgment with respect to Lloyd, concluding he was collaterally estopped from contesting the issue of his *intent* in these civil actions. ***Rogers, Administrator of the Estate of Joshua Rogers v. Lloyd Thomas, et al.***, No. 12 CV 1464 (C.C.P. Lackawanna County, October1, 2014). The intent established in Lloyd's criminal case was that he acted unreasonably. Yet Appellants leap from this conclusion to argue that Lloyd therefore is guilty of acting recklessly, precluding any comparison with negligence. In my opinion, this logic paints with too broad a brush.

---

[5] Appellees point out that while Appellants included a large amount of material from Lloyd's criminal proceedings in the reproduced record, none of it was admitted into evidence in these cases. Appellees Brief at p. 1-2. It has long been well established that this Court may not consider material not in the certified record. ***See*** Pa.R.A.P. 2152, ***Commonwealth v. Young***, 317 A.2d 258, n. 16 (Pa. 1974)( the black letter law that an appellate court is limited in its consideration to the record facts cannot be denied).

Lloyd was convicted of voluntary manslaughter. The crime of voluntary manslaughter is defined under Pennsylvania law as follows:

**§ 2503.  Voluntary manslaughter.**

**(a) General rule.--**A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
(1)  the individual killed; or
(2)  another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

**(b) Unreasonable belief killing justifiable.--**A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

**(c) Grading.--**Voluntary manslaughter is a felony of the first degree.

18 Pa.C.S.A. § 2503.  The facts of these cases did not lend themselves to a charge of voluntary manslaughter based upon a sudden and intense passion resulting from serious provocation. According to the Common Pleas Court decision, the trial court in Lloyd's criminal case submitted to the jury the elements of voluntary manslaughter and the issues of self-defense and justification.  Relevant here is the aspect of voluntary manslaughter that a person may be guilty of that crime if he intentionally kills an individual believing he had justification, but that belief is *unreasonable*.  Nowhere in the plain language of the statute is there a requirement that a person be found to have acted "recklessly" to be guilty of voluntary manslaughter.  Instead, the

statute refers to a person having an "unreasonable" belief that he was justified in killing another person. In the context of voluntary manslaughter, this is referred to as "unreasonable belief voluntary manslaughter" or "imperfect self-defense." **Commonwealth v. Rivera,** 983 A.2d 1211 (Pa. 2009). Imperfect self-defense involves an *unreasonable*, rather than a reasonable, belief that deadly force was required to save the actor's life. **Id.** The language under section 2503 that speaks in terms of a belief being "unreasonable" is language akin to that also used when describing negligence. **See Rutter v. Northeastern Beaver County School District,** 437 A.2d 1198 (Pa. 1981) (the benchmark of negligence is conduct expected of the proverbial reasonable man). Nowhere does this statute, or any authority cited by Appellants, conclusively equate an unreasonable belief under voluntary manslaughter with conduct that is reckless to warrant application of collateral estoppel principles in that regard. Lloyd only was collaterally estopped from denying that he intentionally shot and killed the decedents and that his belief he was justified in using lethal force was unreasonable. Appellants were entitled to have the jury charged that Lloyd was negligent, but not that he was reckless. Accordingly, I would find Appellants' argument that cases precluding comparing reckless conduct with negligent conduct for comparative

purposes is inapposite here. Absent a more developed argument by Appellants, I would reject this claim.[6]

(ii)     New trial as to Outdoorsman

In granting a new trial as to the Outdoorsman, the Majority reasons that, since the jury now will be informed that Lloyd must in fact be found negligent, it could reach a different result as to the Outdoorsman based upon vicarious liability if it finds that Lloyd was an employee acting within the scope of his employment at the time his negligence occurred. Majority Opinion at n. 7. Because I conclude that the trial court's failure to direct that Lloyd must be found negligent was harmless error, it follows that I likewise would not grant a new trial as to the Outdoorsman.

**B. Quashing the Trial Subpoena for Dr. Shovlin**

Since the Majority remands for a new trial, it declined to address whether the trial court erred when it granted the motion to quash and/or for a protective order not to compel Dr. Michael Shovlin's appearance at trial.[7]

_____

[6] Arguably, Appellants may have waived any right to raise this issue, since the special verdict slip submitted by them to the trial court asked the jury both to find that Lloyd intentionally and/or recklessly killed the decedents and *to find whether any of the defendants were negligent*, a point he now contends was error. Appellants' Special Verdict Slip, Nos. 1 and 10.

[7] Typically, the standard of review regarding a motion to quash a subpoena is whether the trial court abused its discretion. However, if the questions raised are purely questions of law, this Court's standard of review is *de novo,* and its scope of review is plenary. ***Leber v. Stretton***, 928 A.2d 262, 266 (Pa. Super. 2007) (citations omitted).

Since I would decline to order a new trial, I would address this issue and conclude that the court did not err in granting the motion to excuse Dr. Shovlin from testifying at trial.

Appellants' counsel subpoenaed Dr. Michael Shovlin, a psychiatrist, neighbor, and friend of Lloyd and Hayden Thomas, to testify at trial commencing on April 16, 2018. Prior to receiving this subpoena, Dr. Shovlin, without counsel, provided testimony in a May 23, 2017 discovery deposition in response to a subpoena served by counsel for Hayden and the Outdoorsman. At the outset of that deposition with the uncounseled Dr. Shovlin present at the insistence of Appellants' counsel, Appellants' counsel voiced objections to the deposition proceeding under the procedural posture of these cases. Deposition of Dr. Michael Shovlin, 5/23/17, at 4-6.[8] Appellants' counsel then proceeded to threaten Dr. Shovlin with a civil lawsuit if he was going to testify that he ever treated Lloyd, given that Lloyd previously testified Dr. Shovlin never provided any treatment to him. *Id.* at 5-6. He further threatened a suit for fraud against Lloyd if that was to be the case. *Id.* Appellants' counsel then announced Dr. Shovlin had the right to have an attorney present in the event he wanted to plead the Fifth due to

---

[8] It appears Appellants' counsel did not think the discovery deposition was proper, since the Rogers case was already listed for trial. It was his contention that deposition would have been proper only if noticed under the Benet case. *Id.*

potential exposure resulting from what he did in this case. *Id.* at 6.[9] Appellants' counsel then demanded to know whether Dr. Shovlin intended to proceed with the deposition without counsel and if he was going to testify without pleading the Fifth. *Id.* At the opening of questioning by defense counsel, Appellants' counsel interrupted to emphasize that if Dr. Shovlin was to be sued, that it would be by a suit commenced by Appellants' counsel. *Id.* at 9. He then asked once again if the witness should be present with counsel. *Id.* Dr. Shovlin's only response was that he was appearing as a fact witness and not as an expert, and that he would not agree to be deposed as an expert witness. *Id.* at 10. He then testified that he was never a doctor to Lloyd, never treated him, never maintained a record, never performed any examination, that Lloyd never came to his office, and that there was never any exchange of payment for any type of treatment. *Id.* He offered advice to Lloyd's father, Hayden, who sought him out in 2005-06, as a result of an incident in South Carolina, to suggest some referral sources to get help for Lloyd. *Id.* at 19-23. He had a conversation with Lloyd that same day wherein he provided the same referral sources for help. *Id.* at 23. The deposition continued until it was time for Appellants' counsel to examine the witness. Immediately upon examining the witness, argument broke out regarding any advice defense counsel may have given the witness and thereafter, banter

_____

[9] It is entirely unclear from this record on what basis Appellants' counsel would make this statement.

began between counsel and the witness over whether there was a doctor-patient relationship with Dr. Shovlin and whether the questions being asked were more appropriate for an expert witness. *Id.* at 32-37. Dr. Shovlin then excused himself from the deposition before its completion indicating that he felt the process was too adversarial. *Id.* at 38.

Pursuant to a February 2, 2018 order, Dr. Shovlin was directed to resume his deposition. At the opening of the deposition proceeding on April 6, 2018, Appellants' counsel served Dr. Shovlin a trial subpoena to appear the first day of trial scheduled for April 16, 2018. Deposition of Dr. Michael Shovlin, 4/6/18, at 9-10. During the course of the deposition, Appellants' counsel explored with Dr. Shovlin his relationship with Lloyd, whether he ever had a doctor-patient relationship with Lloyd, other people that knew Lloyd, the 2005-06 South Carolina incident, the shootings in this case, and in detail his knowledge of any mental health issues experienced by Lloyd or his observations of any bizarre behavior by Lloyd.

On April 12, 2018, counsel for Dr. Shovlin filed a "Motion to Quash Trial Subpoena and/or Motion for Protective Order" ("Motion") pursuant to Pa.R.C.P. 234.4, to excuse Dr. Shovlin from appearing at trial. In his motion, Dr. Shovlin relayed that the May 23, 2017 deposition proceeding was inappropriate, unprofessional, abusive, belligerent, hostile, intimidating and disrespectful, including threatening, without justification or substantiation, to

personally sue Dr. Shovlin and to have him criminally prosecuted.[10]  Motion at ¶ 5.  Dr. Shovlin further relayed that Appellants' counsel repeatedly sparred with and verbally attacked defense counsel, further engendering an intolerable hostile atmosphere in the deposition room, causing him at that point to be in a state of confusion, fear, exasperation, alone and unprotected without legal representation, and causing him to then abruptly depart from the deposition. *Id.*  Dr. Shovlin relayed Appellants' counsel's attempt, without apparent success, to elicit from him admissible testimony that would support a theory of the case that Lloyd suffered from a mental illness or emotional disturbance. *Id.* at ¶ 8.  Dr. Shovlin advised that he and his wife[11] are suffering severe and debilitating medical conditions that would render it impossible for them to appear and testify at trial without exposing them to a risk of grave harm to their physical and emotional health.  *Id.* at ¶ 15.  In particular, Dr. Shovlin advised that he is suffering from post-traumatic stress disorder ("PTSD") and that he is in active treatment under the care of his primary health care provider who has provided him medication therapy and has referred him for

---

[10] The basis upon which Appellants' counsel made the intimidating statements to Dr. Shovlin is not clear, but doing so potentially raises serious concerns about the propriety of counsel's conduct.  *See* Pennsylvania Rules of Professional Conduct 3.1, 4.1, 4.4, and ABA Formal Opinion 92-363 (1992).

[11] While the trial subpoena sought to compel the attendance of both Dr. Shovlin and his wife, Appellants have alleged error only as to the trial court's grant of relief to Dr. Shovlin.  Therefore, I limit my discussion to the doctor and do not discuss his wife.

psychiatric treatment in connection with his disabling PTSD condition. *Id.* at ¶ 16. Attached to his motion was an April 11, 2018 letter from his treating physician. The letter confirmed that, at that time, Dr. Shovlin was suffering from an acute decompensated form of post-traumatic stress disorder in direct relation to a set of circumstances involving his requirement to participate in legal depositions that resulted in severe and life-altering effects on his psychological state. Motion, Ex. A. The letter further advised that Dr. Shovlin was close to experiencing a nervous breakdown as a result of the pressure he was experiencing. The doctor stated, without equivocation, his opinion that if Dr. Shovlin were compelled to appear in court, he may suffer permanent and irreversible harm through the additive effects of that exposure on top of his prior psychological trauma and brittle psychiatric state. This opinion was offered with an "absolute degree of medical certainty" and expressed the doctor's hope that unless the issue is of importance greater than that of the man's life, Dr. Shovlin should not be compelled to appear, at that time or in the foreseeable future. *Id.*

Against this background, Appellants contends that it was error for the trial court to grant the motion for a protective order, since Dr. Shovlin's testimony went directly to the heart of Appellants' cases. Appellants' Brief at 56. During argument on the Motion, Appellants' counsel revealed he was in possession of an August 29, 2013 state police report that contained a summary of an interview with Dr. Shovlin. Appellants state that Dr. Shovlin

is a very close friend of the Thomases and, without providing this Court any detailed comparison, claim that Dr. Shovlin's deposition testimony is the exact opposite of almost everything he stated to the state police. *Id.* at 57. Counsel argued that this testimony went to the very issue of what Hayden knew about Lloyd, N.T., 4/16/18, at 8, and that Dr. Shovlin told Hayden many times about Lloyd's bizarre, paranoid and other behavior, proving Hayden and the Outdoorsman knew of the necessity to control Lloyd's behavior. *Id.* at 26. Counsel admitted—and the court quickly surmised—that he had a copy of this report at the time of Dr. Shovlin's second deposition, but he did not use it, as he was saving it for trial cross-examination. *Id.* at 7, 11. Defense counsel stated that they had not seen this exhibit until one hour before argument that day and that it was not produced in discovery.[12] *Id.* at 17-18. After argument, the trial court, on the record, granted the motion for a protective order, finding that the doctor was medically unable to attend trial. *Id.* at 28.

Under Rule of Civil Procedure 234.4, a court may quash a subpoena to attend trial if, after hearing, the court determines an order is necessary to protect a party, witness or other person from unreasonable annoyance, embarrassment, oppression, burden or expense. This court will affirm a trial court's decision to quash a subpoena unless we find that the court abused its

---

[12] Counsel is reminded of the continuing obligation under our discovery rules to promptly supplement discovery answers respecting persons having knowledge of discoverable matters and to immediately produce copies of any witness statements. *See* Pa.R.C.P. 4007.4, 4003.4.

discretion or committed an error of law. *Commonwealth v. Simmons*, 719 A.2d 336, 340 (Pa. Super. 1998).

In my opinion, the trial court did not abuse its discretion in granting the motion for a protective order for Dr. Shovlin not to appear at trial based upon medical necessity. Foremost, I would reject Appellants' claim because Appellants' argument focuses only on the loss of counsel's ability to cross-examine Dr. Shovlin at trial with the police report, and mentions nothing about the basis for the trial court's decision to excuse Dr. Shovlin based upon medical necessity. Counsel therefore has failed to address the basis of the trial court's exercise of discretion. In my opinion, Appellants' counsel also cannot now complain about the loss of this witness at trial due to his own abusive and intimidating conduct during the deposition that exacerbated Dr. Shovlin's medical condition, precluding him from appearing at trial. It further is my opinion that the loss of counsel's ability to cross-examine Dr. Shovlin with the police report at trial was the result of his own strategic decision not to examine the witness with this document during the deposition when the document was available to him.

I also would not find that the loss of the opportunity to cross-examine on the report prejudiced Appellants' cases. From what I can discern from Appellants' brief, counsel believes that testimony by Dr. Shovlin—that he may have told Hayden about Lloyd's bizarre or paranoid conduct—would have provided the proof necessary to find Hayden liable for his son's actions in these

cases. Assuming for the moment that Dr. Shovlin, through either direct or cross-examination, would have testified he informed Hayden of such behavior, that evidence alone would not have been enough to establish liability upon Hayden for his son's actions. To establish Hayden's liability for his son's actions, it was incumbent upon Appellants to prove that Hayden had the right to control the firearm that was in the possession of Lloyd and that Hayden knew or should have known that Lloyd intended or was likely to use the gun to harm the decedents. *See Wittrien v. Burkholder*, 965 A.2d 1229 (Pa. Super. 2009); Restatement (Second) of Torts § 308. Appellants' claim against Hayden fails at the outset because they did not produce any evidence that Hayden had the right to control the firearm used by Lloyd. Further, it was not possible for Appellants to sustain their burden of proof by merely establishing that Lloyd possessed violent propensities, without any evidence that he was a feebleminded adult with the mental capacity commensurate with that of a young child. *Wittrien*.

### C. Evidence of Prior Bad Acts

Pretrial, Appellants filed motions in limine seeking, *inter alia*, to preclude introduction into evidence chronic drug use by each of the decedents and evidence of any of their violent propensities, criminal records, protection from abuse orders, vehicle violations, and other bad acts. The trial court, citing *Kraus v. Taylor*, 710 A.2d 1142 (Pa. Super. 1998), denied the motion to preclude evidence of chronic drug use, finding that evidence was relevant to

future loss of earnings, but granted the motion as to other prior bad acts. Order, 4/5/18, at 3 n. 3 and n. 4. It was the trial court's conclusion that any evidence as to these prior bad acts would not be probative on the issue of the contributory negligence of either decedent, where Lloyd had no knowledge of any prior bad acts of either of them at the time of the shooting incident. *Id.*

The Majority concludes that the trial court did not err in admitting evidence of chronic drug use. Majority Opinion at 24. I agree and offer no further comment on the admissibility of this evidence. Since the Majority is ordering a remand for a new trial, it declined to address whether the trial court, despite its pretrial ruling, erred by subsequently admitting evidence of prior bad acts after Appellants opened the door to this evidence by presenting testimony regarding the decedents' good character. Since I would not grant a new trial, I address this issue.

Appellants argue that it was error for the trial court to allow defendants to cross-examine the mothers of the decedents concerning the previously excluded other prior bad acts, parroting the trial court's pre-trial ruling that these prior acts were irrelevant, since Lloyd did not know the decedents before he shot them to death. Appellants, however, ignore the reason provided by the trial court as to why it permitted this previously-excluded evidence to be introduced, *i.e.*, because Appellants opened the door after introducing testimony that the decedents were upstanding individuals. Supplemental 1925(a) Opinion, 2/8/19, at 6 n. 7 (citing **Commonwealth v. Nypaver**, 69

A.3d 708, 717 (Pa. Super. 2013) (a litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence)). As Appellants have not seen fit to address the basis upon which the trial court allowed this previously excluded evidence, I see no need to venture further into the issue. I would conclude the trial court did not abuse its discretion in admitting this prior bad act evidence after Appellants opened the door for its introduction into evidence. ***Commonwealth v. Stallworth***, 781 A.2d 110, 117 (Pa. 2001) (admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion).

In conclusion, I respectfully dissent in part from the Majority's decision. Instead, I would deny Appellants' request for a new trial and would affirm the judgment in favor of defendants Lloyd, Hayden, and the Outdoorsman.